## STURGES' SONS

*v.*

## THE METROPOLITAN NATIONAL BANK OF NEW YORK

### for the use of FIELD, PALMER & LEITER

1. BILL OF EXCHANGE—*rights of the drawer as against a party holding the equitable title—who had notice of the fraud by which the bill was obtained.* D, the president of the Producers' Bank of Chicago, sold to F & Co a bill of exchange for $10,000, drawn by the bank, on the Corn Exchange Bank of New York. On the same day, D bought of S & Co, their draft for a like amount on the National Park Bank of New York, giving his check for the same, which was presented the next day for payment and dishonored, the Producers' Bank having failed. S & Co immediately stopped payment of their bill, by a telegram to that effect, addressed to both the Park and Corn Exchange Banks, and which was received

before S & Co's bill reached New York. F & Co, fearing that their bill pur-
chased from D. would be dishonored, called upon him, when he informed them
that he had that day telegraphed to the Corn Exchange Bank, to turn over S &
Co's draft to the Metropolitan Bank, for the benefit of F & Co, and which the
bank did, immediately upon the receipt of the bill, and then presented it to the
Park Bank for payment, which was refused. *Held*, in an action by the Metropol-
itan Bank, for the use of F & Co, against S & Co, to recover on their bill,—

1st. That by the endorsement to the Metropolitan Bank, F & Co only acquired
an equitable title to the bill.

2d. That this action having been brought by the endorsee of the bill, who was
not a holder for value, for the use of F & Co, the proceedings upon their face
show, only an equity in F & Co, and they having never acquired the legal title
to the bill, could not maintain an action at law upon it.

3d. That F & Co, at the time the assignment of the bill was made to the
bank for their use, having had notice of the fact that D fraudulently obtained it
from S & Co, they thereby became affected by the same equities existing between
the original parties to the bill.

2.  SAME—*party receiving—bound to make inquiry.*  The rule is, that where a
party is about to receive a bill or note, if there are any such suspicious circum-
stances attending the transaction, or within the knowledge of the party so receiv-
ing it, as would induce a prudent man to inquire into the title of the holder, or
the consideration of the paper, he shall be bound to make such inquiry, and if
he neglects to do so, he stands affected by the same equities existing between
the original parties. *Russell* v. *Hadduck*, 3 Gilm. 233.

3.  SAME—*who will not be deemed to have taken in good faith.*  And in such case,
where the evidence showed that L, a partner in the firm of F & Co, attended
exclusively to this transaction with D, on the part of the firm, and that he knew
before these several drafts reached their destination, that D had deceived him
concerning his pecuniary condition ; that he had suspended payment; and was
also knowing to the fact that rumors prevailed on the street, at that time, to the
effect that the bill which D had purchased from S & Co had not been paid for,
and that L, on hearing such rumors, inquired of D as to their truth, and D
refused to answer: *Held*, that L, with knowledge of these facts, was bound to
make inquiry concerning D's title to the bill, and having neglected to do so,
F & Co were chargeable with notice of its infirmity.

APPEAL from the Circuit Court of Cook county; the Hon.
ERASTUS S. WILLIAMS, Judge, presiding.

This was an action of assumpsit on a bill of exchange, insti-
tuted in the court below by the appellee, the Metropolitan

National Bank of New York, for the use of Field, Palmer & Leiter, against the appellants, Albert Sturges and Buckingham Sturges. The cause was tried before the court and a jury, and a verdict found for the plaintiff for the sum of $10,885, upon which judgment was rendered, to reverse which, the record is brought to this court by appeal.

The facts in this case fully appear in the opinion.

Messrs. WALKER & DEXTER and Mr. E. A. STORRS, for the appellants.

Messrs. BECKWITH, AYER & KALES, for the appellee.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This is a contest between opposing equities, and the question is, which should prevail.

Appellants make several points. 1st. That the effect of the endorsement of the bill to the Metropolitan Bank for the use of appellees, was to vest in the bank the legal title to the paper, while the equitable title vested in appellees. 2d. The bank has the legal title, but it has no equities, having parted with no consideration for the bill, and therefore ought not to prevail against the equities of appellants. 3d. The bill sued on having been made payable in New York, and having been endorsed and transferred to appellee there, must be governed by the laws of New York, and under those laws a pre-existing indebtedness is not a valuable consideration. 4th. The bill was not actually endorsed or transferred to the bank until after Leiter, one of the firm, had heard that no consideration had been paid by the drawee of the bill; and this, they contend, was notice of their equity, and he took the transfer subject thereto.

Appellees make the points : 1st. That the transaction between the payee of the bill, Doolittle, and Leiter, occurred in this

State, and is governed by the laws of this State. 2d. The endorsee of a bill of exchange before its maturity, taking it as security for a pre-existing debt, and without any express agreement, is deemed a holder for a valuable consideration, and holds it free from any latent defenses on the part of the drawer. 3d, Field, Palmer & Leiter have all the rights in this suit which they would have had if the bill had been endorsed to them, and a suit been brought in their names. 4th. A party who has acquired an equitable title to commercial paper, without notice of any defense thereto, may afterwards, without notice, obtain the legal title, which vests in the holder by relation from the time he acquired his equitable title, and there is no pretense that Leiter had notice of any defense at the time he acquired his equitable title. 5th. The notice of the transfer to those having the nominal legal title, was equivalent to a delivery of the draft to appellees. 6th. A party taking a bill before due for a valuable consideration, without knowledge of any defect of title, and in good faith, holds it by a title valid against all the world. Suspicion of defect of title, or the knowledge of circumstances which would excite suspicion in the mind of a prudent man, or gross negligence on the part of the taker, at the time of the transfer, will not defeat his title; that result can only be produced by bad faith on his part. 7th. There is no evidence of bad faith on the part of Leiter, when he took the draft, and the jury found that there were no circumstances attending the transfer requiring him to make inquiry, even if he was bound to do so.

The first proposition of appellants and the third of appellees, are to the same effect, which we have not considered, it being unnecessary, in the view we have taken of the case, and quite immaterial as to which law governs it, and the appellees have not argued the point. Field, Palmer & Leiter cannot contend they have anything more than an equitable title to this bill of exchange. The legal title, by the endorsement, was in the

Metropolitan Bank, and they alone could endorse it a second time. It being endorsed to the bank for the use of appellees, they became, thereby, the equitable owners.

Here the contest between the equities of these parties begins, and whose equity is the oldest and best?

It is insisted by appellees, that they acquired their title to the bill, without notice of any defense, and when they acquired the legal title, it related back to the time when they acquired their equitable title. We do not understand the case as showing, in any branch of it, that Field, Palmer & Leiter have ever acquired the legal title to this paper. The suit is brought by the bank, as holder of the legal title, which they are, and for the use of appellees, thus showing, upon the face of the proceedings, an equity, only, in them. If they had a right to the legal title, it could only be obtained by a resort to a court of equity.

This is the second point in appellees' brief, and we cannot perceive how the argument can apply to this case, as there can be no pretence that Field, Palmer & Leiter have anything more than an equitable title to the bill. The third point in the brief is to the same purport. There has been no acquiring of the legal title to this bill by Field, Palmer & Leiter, in the name of an agent or trustee, and the inquiry, therefore, as to whether that did not invest them with the same rights as if the bill had been acquired in their own names, does not seem to be pertinent.

The case of *Poirier* v. *Morris*, 2 Ellis and Blac. 88, (75 E. C. L. 89,) was a case where a bill was drawn in favor of Poirier Brothers, of Paris, for value received of Coates & Co., who had failed to pay Morris Prevort & Co., the drawers. It was drawn to pay a debt due Poirier Brothers, from Hovey, Williams & Co., of Boston. The defense was, that the bill was obtained by fraud, but the whole case was left to the court, upon the question, whether Poirier Brothers were holders for value, and so entitled to sue, and the court held they were.

Thus is produced a striking difference between that case, and this, as here, the Metropolitan Bank are not holders for value, never having paid anything for the bill, nor was it received by them in discharge of an antecedent indebtedness from Doolittle to them, or from any other person. This suit is brought by the endorsees of the bill, who are not the holders for value, for the use of Field, Palmer & Leiter. It cannot be, they could sue at law, for the endorsement gives them only an equity. The holders of the legal title must sue. *Moore* v. *Maples et al.*, 25 Ill. 341. The equities of Field, Palmer & Leiter arise alone from this endorsement, caused by the act of Doolittle, without the knowledge or consent of the beneficiaries, to meet a draft he had sold them for the same amount, which was dishonored.

Now, what are the equities of appellants? The bill was purchased of them by Doolittle, and not paid for, of which fact, it is claimed, Field, Palmer & Leiter had notice when the assignment was made by Doolittle to the bank for their use.

What is notice in such a case as this? The rule upon that subject is laid down with great clearness by this court, in the case of *Russell* v. *Hadduck*, 3 Gilm. 233, and from which there has been no substantial departure. When a party is about to receive a bill or note, if there be any such suspicious circumstances accompanying the transaction, or within the knowledge of the party, as would induce a prudent man to inquire into the title of the holder, or the consideration of the paper, he shall be bound to make such inquiry, or if he neglects to do so, he shall hold the bill or note subject to any equities which may exist between the previous parties to it. In other words, he shall act in good faith, and not wilfully remain ignorant, when it was his duty to inquire into the circumstances and know the facts.

Whatever rule different from this, other courts may have adopted, can have no influence upon this court. We are bound to take the rule as given, and to follow it as our safest and only guide. Other courts hold the same. *Morrison et al.* v. *The Gra-*

*nite Bank*, 8 Gray, 259 ; *Roth et al.* v. *Colvin et al.*, 32 Verm. 126 ; *Hale* v. *Hale*, 8 Conn. 337 ; *McKasson* v. *Stanberry*, 3 Ohio (new series), 158 ; *Bassett* v. *Avery*, 15 ib. 299, referring, at page 308, to *Williamson* v. *Brown*, 15 N. Y. 354.

A strong case upon the question of notice, entirely in conformity with the case in 3 Gilman, *supra*, is found in 5 Sanford's N. Y. 157, *Pringle* v. *Phillips*, in which the leading cases, both in this country and in England, are reviewed.

In opposition to these cases, appellees refer to *Goodman* v. *Simonds*, 20 Howard U. S. 343 ; *Goodman* v. *Harvey*, 4 Ad. & Ellis, 870 (31 Eng. C. L. 212), and *Murray* v. *Lardner*, 2 Wallace U. S. 110, as containing a different doctrine.

It is interesting to notice the changes made by the courts, of England especially, in their various rulings upon this question.

So early as 1781, Lord MANSFIELD ruled, in the case of *Peacock* v. *Rhodes*, Doug. 633, that a holder of a bill, coming fairly by it, has nothing to do with the transaction between the original parties.

In 1825, it was held by the Court of King's Bench, ABBOTT, afterwards Lord TENTERDEN, Chief Justice, in *Down* v. *Holling et al.*, 10 Eng. C. L. 602, (4 Barn. & Cress. 330,) that a loser of a check which a shop-keeper had taken in payment of goods purchased of him, might recover its value of the shop-keeper, and the jury were instructed to find for the plaintiff, if they thought the defendant had taken the check under circumstances which ought to have excited the suspicion of a prudent man.

Previous to this, before the same learned judge, the case of *Gill* v. *Corbett et al.*, was decided, 3 B. & C. 466, in which the doctrine was held, that a party taking a bill under circumstances which ought to have excited the suspicion of a prudent and careful man, could not recover on it against the acceptor. This was understood to be the law of that court until the case of *Cook* v. *Fadis*, 5 B & Ad. 909 (27 E. C. L.234). This was an action by the endorsee against the drawer of an accommo-

dation bill, which had been fraudulently disposed of by the first endorsee, and afterwards discounted by the plaintiff, it was held, by Lord DENMAN, Chief Justice, that it was no defense that the plaintiff took the bill under circumstances which ought to have excited the suspicion of a prudent man that it had not been fairly obtained; the defendant must show the plaintiff was guilty of gross negligence.

Afterwards came the case of *Goodman* v. *Harvey*, 4 Ad. & Ellis, cited by appellees, *supra*, wherein Lord DENMAN said: "The question I offered to submit to the jury was, whether the plaintiff had been guilty of gross negligence or not. I believe we are all of opinion, that gross negligence only would not be a sufficient answer when the party has given sufficient consideration for the bill. Gross negligence may be evidence of *mala fides*, but it is not the same thing. We have shaken off the last remnant of the contrary doctrine. When the bill was passed to the plaintiff without any proof of bad faith in him, there is no objection to his title."

This rule was adopted by the Supreme Court of the United States, in *Goodman* v. *Simonds*, 20 Howard, and *Murray* v. *Lardner*, 2 Wallace, *supra*, but has never been recognized by this court—a close adherence being had to the rule in *Russell* v. *Hadduck*, *supra*. The latter rule is clearly recognized in *Farlin* v. *Lovejoy*, 29 Ill. 47, and is consonant with *Gill* v. *Corbitt*, *supra*, and the same is the doctrine of most of the American courts. *Ayer* v. *Hutchins*, 4 Mass. 470; *Wiggin* v. *Bush*, 12 Johns. (N. Y.) 305; *Brown* v. *Tabor*, 5 Wend. 566; *Cave* v. *Baldwin*, 12 Pick. 545; *Hall* v. *Hale*, 8 Conn. 336, citing *Gill* v. *Corbitt*; *Beltzhoover* v. *Blackstock*, 3 Watts, (Penn.) 20; *Hunt* v. *Sanford*, 6 Yerger (Tenn.) 387; *Nicholson* v. *Patton*, 13 Louisiana, 216; *Lapice* v. *Clifton*, 17 ib. 152, and many others to the same effect. The only American case to the contrary, decided by a State court, which we have been able to find, is *Matthew* v. *Paythess*, 4 Georgia, 237, that court

adopting Lord Denman, in *Raymond* v. *Harvey*, in preference to Lord Tenterden in *Gill* v. *Corbitt*.

Lord Denman's rule, as explained by him in *Uther* v. *Rich*, 10 Ad. & El. 784 (37 E. C. L. 232), is much too rigid and exacting, and will lead to less caution in dealing with negotiable paper than should be desired. In that case, it was held, that it was not sufficient to allege, that the plaintiff was not a *bona fide* holder of the bill, that *mala fides* must be distinctly averred. Appellee's fourth point is predicated on this ruling.

Which is the soundest and safest rule, is not now a subject of inquiry for us, one having been established for our guidance in 3 Gilman, *supra*, with which we are satisfied.

Now, did appellees have notice of the infirmity of this bill ? Not directly, as is admitted; but it is insisted, that the position of appellees was such, acting by and through Mr. Leiter, and the circumstances surrounding the transaction at the time, were of such a nature as to put a careful and prudent man on inquiry as to their reality, the principal of which is, that he had good reason to know Doolittle had not paid Sturges for this bill.

We have examined the testimony carefully, and it strikes us as establishing knowledge, on the part of Leiter, that Doolittle had not paid for this bill.

Suppose, instead of transferring the bill, while *in transitu*, to the Metropolitan Bank. when he and Leiter had the street interview on the 19th, Doolittle had taken the bill out of his pocket and delivered it to Leiter, could he recover from the drawers ? No one will pretend he could, for the suit against the drawers would have to be brought in the name of Doolittle, the payee, for the use of Field, Palmer & Leiter, when the want of consideration could be pleaded by the drawers. Is this case different, for the reason the bill was assigned by Doolittle to the Corn Exchange Bank, and by that bank to the Metropolitan Bank, for the use of Field, Palmer & Leiter ?

Field, Palmer & Leiter have but an equity in either case, and in both cases subservient to the older equity of Sturges' Sons, the drawers of the bill.

But in view of the rule in *Russell* v. *Hadduck*, we think the evidence shows most clearly, that Leiter had notice, constructive at least, of a want of honest title in Doolittle to this bill—that he had not paid for it, and that it was fraudulently obtained of the drawers. He had every reason to know and believe it. He knew, on the 19th, that Doolittle had suspended payment—that he had deceived him in regard to his pecuniary condition—that it was rumored on the street that the bill was not paid for, and from Doolittle's refusal to answer the question put to him directly on the point, Leiter must have been well satisfied of that fact. Here, then, are two parties claiming equities, one of them at the time of the transaction, from personal considerations, and not as a strictly business matter, purchases exchange from a person then about to be, and soon after became, his brother-in-law. He had taken no collaterals, and in a day or two after, the bank on which the bill of exchange was drawn by its president, closed its doors, and the bill never was paid. Meeting with the drawer, in the street, then knowing the bank had suspended—had actually closed its doors,—he inquired of him about the bill he had bought of him, if it was all right. The drawer said it was, that he had provided for it, and showed him a dispatch or blank of his mails in transit, assuring him that it contained more than sufficient to cover the draft. He saw the dispatch, and he at once telegraphed to his partner in New York, and to the president of the Metropolitan Bank, asking them to see that the order in the dispatch was duly carried out. This was about 2 o'clock in the afternoon. At 4 o'clock of the same afternoon, he again met with Doolittle, where, is not stated, and when asked if he learned at that time what was in transit to New York, he answers evasively, by saying he did not ascertain definitely—that Doolittle said there was more than sufficient

to pay his draft—it was exchange sent by mail—is not positive that Doolittle told him any of this exchange was Sturges' exchange—that no intimation was made that this exchange was not paid for. Had at this time, and in the morning, doubts about the draft he bought, and when he met Doolittle at 2 o'clock, he was assured by him, that he had been taken care of, and showed the dispatch, which was: "Pass what funds you have on hand, and remittances you receive, over to the Metropolitan National Bank, for the use and benefit of Field, Palmer & Leiter, Chicago." At 4 o'clock, p. m., of this same day, Doolittle told Leiter one of Sturges' drafts was in that mail, that carried funds enough to pay Leiter's draft. It is not pretended it was any other than this $10,000 draft now in suit, and when asked if that draft had been paid for by him, Doolittle declined answering, and there were "all sorts of rumors on the street," and Leiter says he did not know what to believe or disbelieve. If, then, Leiter wanted to know the truth about this, how easy was it for him to walk a few hundred yards to Sturges' office, and there ascertain it definitely. Sturges swears, though his office for business closed at 3 o'clock, it was actually open for all other purposes until 5. In 10 minutes, then, after this interview, Leiter could have learned the fact, that the draft had not been paid for by Doolittle, and that Sturges had taken prompt measures, before that time, to have the payment of it stopped. It is incredible, amid these rumors on the street, and Doolittle's refusal to say that the draft was paid for, that Leiter should not have every reason to believe it had not been paid for. All the circumstances of the transaction imposed upon Leiter the duty of going at once to Sturges, and ascertain Doolittle's title to this bill, and if the consideration was paid. He could so easily have obtained this knowledge, and neglecting so to do, he must be adjuged to hold the bill subject to the equities existing between appellants and Doolittle, because Leiter seems, wilfully, to have avoided a source of information which it was his duty to apply to, and

to which, it seems to us, the ordinary sentiments of honesty would impel him.

Besides, Field, Palmer & Leiter, nor either of them, paid any thing for this bill. It is true, Doolittle got $10,000 of their money for his own bill, but it was not the understanding or agreement that he should put up collaterals, or give any security whatever for his bill.

Leaving, then, the rule of law aside, who, of these parties, is most justly entitled to this bill? Can there be hesitation in the answer? Will not every man say, on these facts, Sturges should not pay the bill? We think the law and the facts sustain them in their claim.

The principle of the doctrine of constructive notice is, that where a person is about to perform an act, by which he has reason to believe the rights of a third party may be affected, an inquiry into the facts is a moral duty, and diligence an act of justice. Hence, he proceeds at his peril, when he omits to inquire, and is chargeable with a knowledge of all the facts that by a proper inquiry he might have ascertained. This neglect is followed by all the consequences of bad faith, and he loses the protection to which his ignorance, had it not proceeded from neglect, would have entitled him.

This was the language of the Court of Appeals of New York, in *Pringle* v. *Phillips*, 5 Sandf. 157. It is in perfect harmony with the case cited in 3 Gilman, and is entitled to our full assent, and more to be preferred than Lord Denman's rule.

Since this decision was made, we have seen and considered the case of *Whistler* v. *Forster*, 108 E. C. L. 246, which, in its leading features, is like this case. The plea was, that the bill was obtained from the defendant by one Griffiths, by means of fraud, and that it was endorsed to the plaintiff after he had notice of the fraud. The instrument was a negotiable instrument, which had been fraudulently obtained from the defendant by Griffiths, and had been handed over to the plaintiff in part

satisfaction of a debt of a larger amount, but Griffiths, at the time he handed over the bill, the plaintiff, omitted to endorse it.

The court held that Griffiths having defrauded the defendant of the bill, he could pass no right by merely handing the bill over to another—that according to the law merchant, the title to a negotiable instrument passes by endorsement and delivery—that the plaintiff's title under the equitable assignment was to be rendered valid by endorsement, but at the time he obtained the endorsement, he had notice that the bill had been fraudulently obtained by Griffiths from defendant, and Griffiths had no right to make the endorsement. Assuming, therefore, the court say, there may be conflicting equities between the plaintiff and defendant, the right should prevail according to the rule of law, and that the plaintiff had no title as transferee of the bill, at all. It was further held, until the endorsement was made, the plaintiff was merely in the position of the assignee of an ordinary chose in action, and has no better right than his assignor, and when he does so, he is affected by fraud which he knew of before the endorsement.

The names being changed, the case is the same as this, for Leiter had notice, while the bill was in transit, by mail, to the Corn Exchange Bank, from whom the plaintiff received it, that the drawee had paid no consideration for it. It is not pretended the plaintiff paid any consideration.

We think the equities of appellants far outweigh those of the beneficiaries under this assignment, and that the bill in the hands of appellees, is subject to their equities. The finding was against the evidence, and the instructions of the court. Field, Palmer & Leiter never united their equities with the legal title, and they are subordinate to those of appellants.

The judgment must be reversed and the cause remanded.

*Judgment reversed.*