## Thomas Bradwell v. James Pryor, et al.

### Gen. No. 12,063.

1. BILLS AND NOTES—*duty of party about to receive.* A party about to receive a bill or note, if there are any suspicious circumstances, should make inquiry.

Action of assumpsit. Appeal from the Superior Court of Cook County; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1904. Affirmed. Opinion filed December 22, 1905.

**Statement by the Court.** During the first part of the year 1902 the Chamberlain Transportation Company was the owner of the steamer Worthington and two schooner barges, the Wilbur and the Bliss, the barges being used as two barges or consorts of the steamer. These vessels were employed in the lumber trade between Chicago and Lake Superior ports. S. R. Chamberlain was president of the transportation company and also a member of the firm of S. R. Chamberlain & Co., Gordon C. Blair being the other partner. This firm was engaged in the business of vessel agents and vessel brokers in Chicago.

In August, 1902, the Chamberlain Transportation Company became financially embarrassed and was unable to procure fuel and supplies for the vessels. Libels had been filed in the United States District Court to recover for supplies furnished and the vessels had been seized. At this juncture of its affairs appellant Thomas Bradwell, who was attorney for the company, furnished bonds for the release of

the vessels. The transportation company then conveyed the steamer to appellant Bradwell and entered into a contract with him whereby the steamer was to tow the Wilbur and the Bliss, for which service appellant was to receive one-third of their freight earned. Thereupon the whole fleet was chartered by S. R. Chamberlain & Co. for cargoes of lumber from Lake Superior points to Chicago. The Worthington was chartered to the Hines Lumber Company, the Bliss to Claney & Company, and the Wilbur to the Hartwell Lumber Company. While the vessels were in the performance of these charters, the Wilbur and the Bliss being in tow of the Worthington, the Wilbur went ashore or was stranded in Lake Superior at a place called Superior Entry, near Houghton, Michigan, about September 11, 1902.

The cargo of the Wilbur was insured by the Ætna Insurance Company, represented in Chicago by F. H. Osborn. Upon receiving notice of the stranding of the vessel Mr. Osborn went to Houghton, took charge of the cargo and employed Whitney Bros. of that place to remove the deck-load of the cargo from the Wilbur and place it on the dock at Houghton. When the lumber was removed from the Wilbur, Whitney Bros. gave Capt. W. J. O'Brien, the master of the Wilbur, a receipt for the lumber. Mr. Osborn placed the lumber in charge of Whitney Brothers as security for the payment of their bill, amounting to about $3,000, and returned to Chicago.

S. R. Chamberlain hearing of the grounding of the Wilbur went at once to Houghton. Arriving there he talked with appellant over the telephone and requested him to send Blair to Houghton as he wished to see him about insurance matters. Gordon C. Blair, who was at this time the partner of S. R. Chamberlain, had gone to Houghton two or three years previous to this as an adjuster representing insurance companies and had taken charge of two stranded vessels, had the cargoes removed to Houghton and, under the direction of the insurance companies, had sold the cargoes to James Pryor & Son, appellees. Blair obtained money from appellant Bradwell to cover his expenses and went to Houghton, arriv-

ing there September 16, 1902. He went to appellee John
Pryor and introduced himself as the insurance man who had
previously sold them the cargoes of the Mead and the Me-
diator, under similar circumstances. He represented to Mr.
Pryor that the schooner was in distress; that O'Brien the
master owed about $3,000 at Houghton and he could not ob-
tain any money from the owner and he wished to sell a part
of the cargo then piled on the dock. After some negotiation
a sale of the lumber was agreed upon to appellees for $3,000.
Blair informed Mr. Pryor that O'Brien, the master of the
Wilbur, was the proper man to sign the bill of sale, and told
him to make his check payable to the order of Wm. J.
O'Brien, master of the Wilbur. Captain O'Brien, upon re-
ceiving the check, signed a receipt acknowledging payment
of $3,000 in full for the lumber lightered from the schooner
Wilbur.

On the same day, September 17, 1902, O'Brien having
endorsed the check and had his signature identified by Pryor,
cashed the check and received $3,000 in currency. Having
used a part of the money, on the next day he purchased a
draft on the First National Bank, Chicago, for $2,500 and
endorsed it and gave it to Chamberlain, who left for Chicago,
where he arrived September 19, 1902. Chamberlain went
to the office of appellant, handed him the draft and told him
to take out what the Chamberlain Transportation Company
owed him, and if there was anything left to turn it back to
him. At this time the transportation company was indebted
to appellant for money advanced, for attorneys' fees, and on
other matters. Appellant kept the draft for about twenty
minutes and handed it to Chamberlain, requesting him to
go over to the bank and get the money on it.

In the meantime appellees having attempted to remove
the lumber to their own yard, were notified by Whitney
Bros. that the lumber was in their possession. Upon inquiry
appellees then learned that Blair did not represent the in-
surance company but that it was represented by Osborn.
They also learned of the draft and had the payment of it
stopped and the bank refused to honor the draft. Appellees

brought this bill to rescind the sale for fraud and to recover the $2,500 which had been put into the draft on the First National Bank of Chicago, making all the parties to the transaction defendants. Answers were filed by all the defendants. On hearing the court entered a decree according to the prayer of the bill.

JOSEPH A. McINERNEY and GEORGE S. BAKER, for appellant.

KREMER & GREENFIELD, for appellees.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The fundamental question presented by this record is whether or not appellant Bradwell is a *bona fide* holder of the draft for $2,500 placed in his hands by S. R. Chamberlain.

The rule regarding the transfer of negotiable paper under circumstances similar to those existing in this case was clearly stated in Russell v. Haddock, 3 Gilm., 233, as follows: "The rule undoubtedly is that where a party is about to receive a bill or note, if there are any such suspicious circumstances accompanying the transaction, or within the knowledge of the party, as would induce a prudent man to inquire into the title of the holder or the consideration of the paper, he shall be bound to make such inquiry, or if he neglects to do so, he shall hold the bill or note subject to any equities which may exist between the previous parties to it. In other words, he shall act in good faith, and not wilfully remain ignorant where it was his duty to inquire into the circumstances and know the facts." In Sturges v. Met. Nat. Bank, 49 Ill., 220, this rule was again restated in the same terms.

The law, however, imposes no such burden upon the receiver of negotiable paper for value in the ordinary course of business until he has notice or knowledge of facts which on inquiry would lead to notice of defective title or want of consideration. Morris v. Preston, 93 Ill., 215. The question then is, did appellant Bradwell have knowledge of such

facts that on inquiry would have led him to notice or knowledge of the fraud by which the money represented by the draft was obtained from appellees.

The record discloses many uncontroverted facts which were sufficient to put appellant on inquiry touching the circumstances under which the draft was obtained, and its consideration. The fact that he was the attorney and adviser of the Chamberlain Transportation Company; that the company was in financial straits, so that its vessels had been libeled for supplies; that appellant had released the vessels from seizure by giving bonds; the fact that he had made advances to the company from time to time to tide it over its financial difficulties; that the company had transferred to him the steamer Worthington because of its financial difficulties and its obligations to appellant, and that a contract existed by which in consideration of towage of the Wilbur and the Bliss appellant was to receive one-third of the freights earned by those vessels and that at the time the Wilbur was stranded the vessels were working under this contract; that he knew when the Wilbur was stranded and that both Chamberlain and Blair came to him for expense money to go to Houghton; that neither the company nor Chamberlain nor Blair had any money or ready means of securing any except from appellant, up to a few days before Chamberlain handed appellant the draft in question—these facts were known to appellant and would suggest in a most direct way that the sudden possession of a draft for $2,500 as the quick result of the disaster to one of its vessels needed some explanation.

If the inquiry had been followed up it would have led appellant to the fact that the draft represented money received by Chamberlain for lumber which he had no right to sell and to which he could give neither title nor possession. Inquiry would have led to the fact that the sale was brought about by concealing the fact that the lumber had passed out of the possession of the master of the vessel who had delivered it to Whitney Bros. and taken their receipt for it, and by the false impression which Blair gave to appellees to the

effect that he represented the insurance on the cargo and that the master of the vessel in conjunction with the insurance company had the lumber and the right to sell it in order to meet bills amounting to $3,000 there in Houghton.

The fraud perpetrated upon appellees by Chamberlain and Blair was so bold that it needs only a statement of the undisputed facts for its demonstration. Each fact by itself and all the facts taken together lead to the conclusion that appellant was put on notice of the fraud by reason of the circumstances surrounding the transaction and consequently he is not a *bona fide* holder of the draft for value in the eye of the law. The decree must be affirmed.

*Affirmed.*