THOMAS BRADWELL

*v.*

JAMES PRYOR *et al.*

*Opinion filed June 14, 1906.*

BILLS AND NOTES—*when assignee of bill before maturity will be protected.* An assignee or endorsee of commercial paper before maturity, for a valuable consideration, who takes it without knowledge of any defects and in good faith, will be protected against the defenses of the maker even though there are suspicious circumstances attending the transaction sufficient to put a prudent man upon inquiry; and one who assails his title has the burden of proving, by a preponderance of the evidence, that he acted in bad faith. (*Russell* v. *Hadduck,* 3 Gilm. 233, and *Sturges* v. *Metropolitan Nat. Bank,* 49 Ill. 220, overruled.)

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

In July, 1902, S. R. Chamberlain and Gordon C. Blair were vessel agents and vessel brokers in the city of Chicago. The Chamberlain Transportation Company, of which the former was president and the latter secretary, was the owner of the steamer *Worthington* and two schooner barges, the *Wilbur* and *Bliss,* which were used as tow barges or consorts of the steamer, the whole fleet being employed in the lumber trade between Chicago and Lake Superior ports. In August, 1902, the Chamberlain Transportation Company became financially embarrassed and was unable to procure fuel and supplies for the vessels upon its own credit, and libels were filed against them in the United States District Court to recover for supplies furnished and they were seized by the United States marshal. Appellant, Thomas Bradwell, was attorney for the company and furnished bonds for the release of the vessels, and the steamer was conveyed to him as security for the obligation thus contracted. He en-

tered into a contract with the company whereby the steamer was to tow the two barges, and he was to receive one-third of their freight for such towage services.  After the transfer the whole fleet was chartered for cargoes of lumber, the *Worthington* to the Hines Lumber Company, the *Bliss* to Claney & Co. and the *Wilbur* to the Hartwell Lumber Company.  On September 11, 1902, while the respective vessels were in the performance of their charters, the *Wilbur* became stranded on the beach in Lake Superior, a short distance from Houghton, Michigan.  Her cargo was insured by the Ætna Insurance Company, represented by F. H. Osborn, of Chicago, and as soon as he received notice of the wreck he went to Houghton, took charge of the cargo, and employed Whitney Bros. to remove about three hundred thousand feet of lumber from the decks of the barge to the dock at that place.  After the removal, William J. O'Brien, the master of the barge, obtained a receipt from Whitney Bros. for the cargo, and Osborn placed the lumber in their charge to secure the payment of their bill, amounting to about $3000.  After the stranding of the vessel Chamberlain and Blair were both notified by the master, and Chamberlain called at the office of appellant, Bradwell, and told him that the schooner was in distress, and was furnished money by appellant to go to Houghton, which he did, arriving on the morning of September 12.  After his arrival he called appellant by telephone and requested him to send Blair to the scene of the wreck.  Blair, two or three years prior, had been adjuster representing insurance companies, and had taken charge of two stranded vessels, the *Mead* and *Mediator*, and had sold the cargoes to appellees, James Pryor & Son.  When Blair arrived at Houghton he went to see the Pryors and introduced himself as the insurance adjuster who had previously sold them two cargoes of lumber, and he told them that the *Wilbur* was in distress and that he would like to sell them the lumber on board.  After some negotiation the Pryors purchased the lumber and gave in

payment therefor a check for $3000 on the National Bank of Houghton, payable to the order of William O'Brien, the master of the vessel. On the same date O'Brien went to the bank, cashed the check and received $3000 in currency, $500 of which he used in the payment of bills and with the remaining $2500 purchased a draft on the First National Bank of Chicago. A few days after the sale the Pryors attempted to remove the lumber, and were informed by Whitney Bros. that it was in their possession, and that Blair and O'Brien had no authority to sell it. On September 18, 1903, Chamberlain arrived in Chicago with the draft issued to O'Brien. He went to the office of the appellant, Bradwell, handed him the draft and told him to take out of it what the Chamberlain Transportation Company owed him, and if there was anything left, to pay it to the company. It is claimed that at this time the Chamberlain company was indebted to Bradwell in the sum of $1200 for money advanced and in the sum of $700 for attorney's fees, and that Bradwell had signed three bonds in the United States District Court for the company, amounting to $1200, on which judgment had been rendered. Bradwell kept the draft about twenty minutes and then handed it back to Chamberlain and told him to take it over to the bank and get the money. Payment had been stopped by the Pryors, and upon its presentation the payment was refused, which fact was stamped across the face of the paper by a paying teller. Chamberlain returned to the office of Bradwell, who then took the draft and presented it for payment, but it was again refused.

Appellees filed their bill in the superior court of Cook county to rescind the sale for fraud and to recover the $2500, the amount of said draft on the First National Bank of Chicago. All interested parties were made defendants, including the First National Bank of Houghton. Answers were filed by the two banks, admitting that they held the $2500 represented by the draft, and alleging that they were ready to pay the same to such parties as the court might direct. Upon

a hearing a decree was entered which found that Thomas Bradwell did not receive the draft in the regular course of business as an innocent *bona fide* holder for value, and that at the time he received it he had knowledge of the rights of the plaintiff, and that the draft did not pass to him free from the rights and equities of the plaintiff. From this decree an appeal was prosecuted to the Appellate Court for the First District, where the decree was affirmed, and a further appeal has been prosecuted to this court.

JOSEPH A. McINERNEY, and GEORGE S. BAKER, for appellant.

KREMER & GREENFIELD, for appellees.

Mr. JUSTICE WILKIN delivered the opinion of the court:

It is first insisted that the Appellate Court committed error in holding that where a party is about to receive a bill or note, and there are such suspicious circumstances accompanying the transaction or within the knowledge of the party as would induce a prudent man to inquire into the title of the holder or into the consideration of the paper, he is bound to make such inquiry, and if he neglects to do so he holds the bill or note subject to any equities which may exist between the previous parties. The above holding of the Appellate Court is based on the cases of *Russell* v. *Hadduck,* 3 Gilm. 233, and *Sturges* v. *Metropolitan Nat. Bank,* 49 Ill. 220, and is undoubtedly supported by these authorities. But since the holding in those cases the rule has been somewhat modified by the decisions of this court and is not sustained by courts generally throughout the country. The rule now is, that the endorsee or assignee of commercial paper who takes the same before maturity for a valuable consideration, without knowledge of any defects and in good faith, will be protected against the defenses of the maker, and mere suspicion of defect of title or the knowledge of circum-

stances calculated to excite suspicion in the mind of a prudent man, or even gross negligence on his part at the time of the transfer, will not defeat his title. In other words, the only thing which will defeat his title is bad faith on his part, and the burden of proof is upon the person assailing his right to establish that fact by a preponderance of the evidence. (*Matson* v. *Alley,* 141 Ill. 284; *Bemis* v. *Horner,* 165 id. 347; *Merritt* v. *Boyden,* 191 id. 136; *Murray* v. *Beckwith,* 81 id. 43; *Shreeves* v. *Allen,* 79 id. 553.) However harsh this rule may, on first impression, seem to be, it is based upon the policy of the law which gives full faith and credit to commerical paper transfered before maturity, so that it may circulate, as far as possible, with all the conveniences of currency. We are of the opinion, therefore, that the Appellate Court improperly announced in its opinion, as the law of this State, the rule laid down in the earlier cases of *Russell* v. *Hadduck,* and of *Sturges* v. *Metropolitan Nat. Bank, supra.*

It does not follow, however, that the Appellate Court improperly affirmed the decree of the superior court. That must still depend upon whether the testimony produced upon the hearing under the correct rule justified the chancellor in finding that appellant was not a *bona fide* holder of the paper. The contention of his counsel is, that the evidence fails to support the finding that he was not a *bona fide* holder for value before maturity, or that he had notice of such facts as should charge him with knowledge of the fraud by which the draft was obtained. This was purely a question of fact, to be ascertained from all the evidence produced upon the hearing.

The record shows that for some time prior to the transaction Bradwell had been the attorney for the Chamberlain Transportation Company and was familiar with all its affairs, including its financial embarrassment. About thirty days before the wreck the vessels had been seized under orders of the United States District Court, and he had fur-

nished bonds for their release. The steamer was conveyed to him, and he entered into a contract by which she was to tow the barges, he to receive one-third of the freight. To this extent, at least, he was jointly interested with Chamberlain and Blair, and was a party to the contract entered into with the various lumber companies for the transfer of cargoes of lumber to Chicago. Upon the date of the wreck he was notified of the accident and furnished money for both Chamberlain and Blair to go to Houghton. Within a few days Chamberlain returned with a draft for $2500 and delivered it to him. The terms under which the draft was delivered do not satisfactorily appear from the evidence. On the one hand it is claimed that he received it in payment of claims due him from the company, while on the other hand the testimony tends to show that he received it as a part of his share of the freight earned by the vessels, and also that it was merely put in his hands for the purpose of collection. Chamberlain, subsequent to the delivery, made an affidavit to the effect that it was given to appellant for collection and that he subsequently demanded its return, which was refused, appellant giving as his reason for such refusal that he had a claim against the company, and intended to hold the draft for the payment of the claim as soon as it was collected. There is also some evidence in the record, though perhaps slight, tending to show that the selling of the cargo and collection of the money was a part of a plan or scheme arranged by Chamberlain and appellant, appellant having full knowledge of all the details.

On the whole record we are not prepared to say that the superior court committed error in decreeing that appellant was not a *bona fide* holder of the draft for value, without notice. While the testimony is conflicting, we think it fairly preponderates in favor of the finding of the chancellor.

The judgment of the Appellate Court will accordingly be affirmed.                                    *Judgment affirmed.*