# Anderson National Bank, Appellant, v. James H. Jacobson, Appellee.

## Gen. No. 41,005.

Heard in the second division of this court for the first district at the December term, 1939.

Opinion filed April 2, 1940. Opinion modified and rehearing denied May 28, 1940.

Parker & Clusman, of Chicago, for appellant; Albert E. Hallett, Jr., of Chicago, of counsel.

Mayer, Altheimer & Kabaker and Frank J. Jacobson, all of Chicago, for appellee; Frank J. Jacobson, of Chicago, of counsel.

Mr. Justice Friend delivered the opinion of the court.

Anderson National Bank of Lawrenceburg, Kentucky, claiming to be the holder in due course of a promissory note for $4,074, brought suit against James H. Jacobson of Chicago, as its maker and signer, for the face amount of the note, together with accrued interest and costs of suit. Pursuant to a hearing by the court without a jury, judgment was entered in favor of defendant, from which plaintiff appeals.

In view of the defenses interposed a recital of the essential facts is necessary to an understanding of the issues involved. W. D. Mountjoy, the payee of the note involved in these proceedings, lived near Lawrenceburg, Ky., where he had for many years engaged in the training and selling of saddle horses. His neighbor, J. W. Gaines, whom he had known from boyhood, was president of the Anderson National Bank. Mountjoy had dealt with the bank for some 30 years and his accounts were always handled by Gaines personally. On July 8, 1937, the defendant, James H. Jacobson, of Chicago, who had a horse farm at Lake Geneva, Wisconsin, visited Mountjoy, from whom he had been purchasing horses since 1933, at his farm near Lawrenceburg. He purchased one horse known as "Royal American," for the sum of $3,500, as evidenced by his note to Mountjoy's order for that sum. This note was subsequently paid and is not involved in these proceedings. On the same day Mountjoy also showed Jacobson another horse, known as "Mighty

King,'' a pedigreed animal possessing good qualities but apparently having a split quarter or hoof. Mountjoy prevailed upon defendant to take Mighty King to his farm in Wisconsin and give it expert medical care and attention in an effort to cure the defective hoof, to which defendant agreed. Mountjoy at that time owed the bank on several notes secured by a chattel mortgage on all his horses except colts and unregistered animals. Mighty King was included in this chattel mortgage. Jacobson testified that before allowing him to take Mighty King, Mountjoy stated that he would have to have Jacobson's note to show the bank, and that it would help him if a value of $5,000 were placed on the horse; that he would use the note only as a record to show the bank where the horse had gone; and that if the split hoof failed to heal within a reasonable time he would then return the $5,000 note to Jacobson. Accordingly, Jacobson executed two promissory notes, one for Royal American, in the sum of $3,500, and one for Mighty King, in the sum of $5,000, and shipped both horses to his farm at Lake Geneva, Wis. The second of these notes was dated July 8, 1937, was due in 90 days, carried interest at the rate of 6 per cent after maturity, and bore the legend on its face ''For Mighty King #14468 Saddle Horse.'' Mountjoy then indorsed both of these notes and sought to discount them at the Anderson National Bank. The bank was unwilling to actually purchase or discount them, because it was unable to get a satisfactory credit rating on Jacobson, but it did lend Mountjoy $3,000 and took the two notes as collateral security for the loan. When the notes fell due on October 5, 1937, Jacobson paid off the $3,500 note, which amount was applied by the bank in payment of Mountjoy's $3,000 loan and the $500 excess was placed to his credit.

November 2, 1937, Mountjoy again sought to discount the remaining $5,000 note, but the bank refused so to

do because of its inability to secure a satisfactory credit rating on Jacobson. It did, however, make a new loan of $2,600 to Mountjoy on his personal note, and took the $5,000 Jacobson note as collateral security. The $2,600 note was to fall due January 11, 1938, and $2,570 of the $2,600 loan was immediately placed to Mountjoy's credit and the $30 discount was taken by the bank.

J. W. Gaines, president of the Anderson National Bank, was an experienced bookkeeper and had direct supervision of the bank's books. The transaction of November 2, 1937, as reflected in the books of the bank, showed the new loan to Mountjoy on November 2nd, secured by the original Jacobson note as collateral, and the amount of the loan, less $30 discount, was placed subject to Mountjoy's order on the bank's books. Shortly before Mountjoy's $2,600 note fell due in January, 1938, the bank sent the original $5,000 Jacobson note, which it then held as collateral, to the Continental Illinois Bank & Trust Company in Chicago, for collection, but payment was refused and it was protested and returned to plaintiff. Plaintiff bank then learned that Jacobson had previously made a direct payment of $1,000 to Mountjoy on this $5,000 note, and accordingly it sent the note back to the Continental Bank with the request to secure a renewal note from Jacobson for the corrected balance of $4,000, plus accrued interest. Jacobson complied with the request and executed a renewal note in the sum of $4,074, and received back his original $5,000 note marked "Cancelled by renewal." The renewal note was likewise payable to the order of Mountjoy, was dated January 6, 1938, became due April 6, 1938, and bore the same legend "For Mighty King," etc., as did the original $5,000 note. Sometime thereafter Mountjoy indorsed the $4,074 renewal note, and on February 2, 1938, he requested the bank, which was then holding it

as substituted collateral on Mountjoy's $2,600 personal note, to discount or purchase the new note. He called Gaines' attention to the fact that Jacobson's credit had now been established through his payment of the $3,500 note and of $1,000 on account of the original $5,000 note, and in compliance with his request the bank on February 2, 1938, actually purchased and discounted the new $4,074 Jacobson note, upon which this suit is predicated. The note was purchased before maturity and was actually paid for in full by canceling and returning to Mountjoy his personal note for $2,600, crediting the balance of $1,465 against another note on which Mountjoy then owed the bank some $11,800, and which was secured by chattel mortgage on a number of Mountjoy's horses. At the same time several horses were released from the lien of the chattel mortgage then held by the bank. This transaction of February 2, 1938, was reflected on the books of the bank by showing that Jacobson was as of that date accepted as the principal debtor and that Mountjoy's liability was reduced to that of a mere indorser; also that Mountjoy's $2,600 note was paid off with part of the proceeds of the $4,074 note and the balance of $1,465 applied against the other $11,800 note which was secured by chattel mortgage on other horses.

The new Jacobson note for $4,074 became due April 6, 1938. When presented through plaintiff's Chicago correspondent Jacobson refused to pay it and it was returned to the Anderson National Bank. Gaines immediately wrote Jacobson demanding payment and receiving no reply called him on the long distance telephone and advised him that the bank was holder of the note in due course, for value, without notice of any infirmities, and insisted on payment. Jacobson then advised Gaines that the delivery and payment of the note depended upon the healing of Mighty King's hoof and refused to pay. Gaines testi-

fied that this conversation was the first notice to the bank of any alleged infirmity in the instrument or any defect in title of the person negotiating it; that he was the only one at the bank who had ever handled Mountjoy's account; that he had no conversation with Mountjoy concerning the transaction upon which the original $5,000 note was predicated beyond Mountjoy's statement that he had sold two of his horses to Jacobson and had received two notes for a total of $8,500. Gaines stated that he did not inquire further into the transaction, did not ask Mountjoy what the legend "Mighty King" on the note meant, and knew nothing of the purported agreement between Jacobson and Mountjoy whereby the original $5,000 note was not to be negotiated until so advised by Jacobson himself after the maturity of the $4,074 renewal note.

Defendant relies on three principal defenses: (1) that under the terms of the sale of Mighty King payment was conditional upon the healing of the split quarter, or hoof, with the right to return the horse and receive back the consideration paid therefor in the event that the injury did not respond to treatment within a reasonable time; (2) the conditional delivery of the note to Mountjoy for the purpose of exhibiting it to the bank to show that he had received something of value therefor, and to account for the horse, which was included in the chattel mortgage held by the bank, with the express understanding, however, that the note was not to be negotiated or sold, and the consequent violation of this agreement by Mountjoy; and (3) failure of the bank to give Mountjoy any such valuable consideration for the note as would support a judgment in its favor.

Defendant's original answer admitted "that on or about January 6, 1938, he delivered his promissory note to W. D. Mountjoy." However, upon trial his counsel adduced evidence, over plaintiff's objection,

to support the defense of a conditional delivery. The cause was tried November 17, 1938. Thereafter the court took the case under advisement on briefs filed by the respective counsel. February 27, 1939, more than three months thereafter, but before final judgment was entered against plaintiff March 24, 1939, defendant filed an amended and supplemental answer. Plaintiff asserts that it had no notice of defendant's intention to file an amended answer, and the record is silent on the subject. Defendant's counsel insist, however, that leave was had in open court, and that through error of the clerk, the order was not entered. The amended answer interposed the defense of a conditional delivery. After the appeal was perfected plaintiff made a motion in this court to strike the amended answer, on the ground that it had been filed without notice to plaintiff and without leave of court, and its counsel argue that the amended answer and evidence in support thereof had no place in the record and should not be considered in determining the issues between the parties. We denied the motion, however, because in his countersuggestions defendant asserted that leave of court had been obtained. In the view that we take of this case the defense of conditional delivery is not of controlling importance.

Plaintiff's suit is predicated upon a negotiable instrument on which it sues as the holder in due course, without notice of any infirmities and for which it claims to have paid a valuable consideration. The note is regular on its face and has all of the characteristics and requirements of a negotiable instrument; it is unusual only in respect to the legend, "For Mighty King," etc., which appears thereon. Defendant's counsel say that this legend indicates that the note was given as part of the transaction related by defendant and they argue that because of the long and intimate relationship between Gaines and Mountjoy, it is in-

conceivable that Mountjoy did not apprise Gaines of the circumstances under which the note was given and explain to him the meaning and significance of the legend. However, according to the uncontroverted evidence adduced upon the hearing, it is clear that Gaines neither inquired nor was he informed of the circumstances relating to the alleged conditional delivery of the note, or the conditional sale of the horse because of its physical defect. Moreover, it is entirely reasonable to assume that since many of Mountjoy's horses, including Mighty King, were included in a blanket chattel mortgage held by the bank, some of which were from time to time released from the lien of the mortgage as payments were made by Mountjoy on his several notes held by the bank, that the legend was placed upon the face of the note merely for purposes of identification and so as to account for the horse when the sale to Jacobson was made. Gaines would have been fully justified in so treating the legend, if he noticed it at all, without any suspicion arising in his mind as to its meaning. Certainly, the placing of the legend on the note does not have the effect of destroying the negotiability of the note, nor would it in the absence of evidence justify the court in assuming that Gaines knew or had been advised of the conditional arrangements attending the sale of the horse and the delivery of the note.

Under par. 79, Title I, Article IV of the Illinois Negotiable Instruments Act (sec. 59, ch. 98, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 89.079]), every holder of a note is deemed prima facie to be a holder in due course. Defendant does not deny that he signed the note and the evidence discloses without dispute that Mountjoy indorsed the instrument before maturity. Likewise there is a presumption in the first instance that the delivery of the note held by plaintiff was valid and intentional, and under par. 36, sec. 16,

Title I, Article I of the Negotiable Instruments Law [Ill. Rev. Stat. 1939; Jones Ill. Stats. Ann. 89.036], "where the instrument is no longer in the possession of a party whose signature appears thereon, a valid and intentional delivery by him is presumed until the contrary is proved." This placed the burden of proving conditional delivery upon defendant. He sought to sustain this burden by evidence tending to prove that Mountjoy merely wanted to exhibit the note to the bank, so as to show that he had received something of value therefor and to account for the horse, but with the understanding that the note was not to be negotiated or sold. This testimony had reference to Jacobson's original $5,000 note. However, there is no testimony whatsoever to indicate that the delivery of the $4,074 renewal note was in any way conditional, or that its acquisition by plaintiff was in violation of any agreement. It must be assumed that when the renewal note was given, some four months after the $5,000 note had been delivered to Mountjoy, that Jacobson then knew that it was being used for some purpose other than as a mere inventory record, especially since he had in the interim paid $1,000 on account of the indebtedness to Mountjoy. Upon this state of the record, we are impelled to hold that defendant failed to sustain the burden cast upon him of proving that plaintiff was not a holder in due course. Plaintiff's uncontroverted evidence, without the aid of any presumption, shows the bank to have been a holder in due course.

Under par. 72, sec. 52, Title I, Article IV of the Negotiable Instruments Law [Ill. Rev. Stat. 1939; Jones Ill. Stats. Ann. 89.072], a holder in due course is one who has taken the instrument under the following conditions: (1) That the instrument is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice

that it has been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; and (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.

We have already indicated our reason for concluding that the note was complete and regular upon its face.

As to the requirement that the holder in due course must have been the holder of the note before it was overdue, the record shows that the renewal note of $4,074, upon which suit is based, was dated January 6, 1938, and was not due by its terms until April 6, 1938. It was acquired by plaintiff about the time when it was made, and long before its due date.

Nor can the good faith of the bank in acquiring the note be questioned, under the evidence adduced upon the hearing. Defendant's answer does not raise this issue and therefore plaintiff was not obliged to prove that it had acquired the note in good faith, but if this were an issue we should be obliged to hold that there were no suspicious circumstances of which the bank or its president had any knowledge from which the bank's good faith could be questioned. The courts have uniformly held that mere suspicion or even negligence on the part of the taker are nevertheless consistent with good faith and are not sufficient to prevent the indorsee from becoming a holder in due course within the meaning of the statute. (*Kavanagh v. Bank of America,* 239 Ill. 404; *Bradwell v. Pryor,* 221 Ill. 602; *Page v. W. F. Hallam & Co.,* 212 Ill. App. 462.)

As to the fourth condition imposed by the statute it is clear that neither Gaines nor the bank had notice of any infirmity in the instrument or defect in Mountjoy's title thereto. Gaines stated positively, on both direct and cross-examination, that he did not discuss the circumstances of the sale with Mountjoy, and that the

presence or purpose of the legend "For Mighty King," etc., was not mentioned or called to his attention; Mountjoy merely told him that he had sold two horses to Jacobson, for which he took notes aggregating $8,500. Defendant's counsel argue that since Mountjoy was a resident of Kentucky they could not compel his response to a subpoena at the trial and that plaintiff, his friend and neighbor, should have produced him, but since plaintiff was suing as a holder in due course, without notice of any infirmities, on a note for which it claimed to have paid a valuable consideration, Mountjoy's testimony was not necessary to prove a prima facie case under the allegations of the complaint.

In his original answer defendant interposed the defense that there was a failure of consideration between the original parties to the note, in that the horse's hoof did not respond to treatment, and he was therefore justified in rescinding the transaction and was entitled to the return of the note. This defense would of course be available as against a party who was not a holder in due course, or as between the original parties to the transaction where the note had not been negotiated, but in view of our conclusion that the bank was a holder in due course, without notice of any infirmities, this defense is not applicable to the circumstances of this case. So far as the record discloses, defendant still has Mighty King. According to the evidence he spent considerable time and effort in trying to heal the split hoof, but without avail. In his answer he proffers the return of the horse, but there is no indication that any such offer was made until after suit was brought. In any event, as far as this record shows, plaintiff knew nothing of the physical defect of the horse, nor of the conditions under which the sale was made between the parties.

The remaining defense relates to the consideration paid by plaintiff for the $4,074 note upon which this action was brought. Under secs. 25, 26, pars. 45, 46,

Title I, Article II of the Negotiable Instruments Law [Ill. Rev. Stat. 1939; Jones Ill. Stats. Ann. 89.045, 89.046], value is "any consideration sufficient to support a simple contract." We have already related the circumstances under which this note was acquired by the bank. It was given as a renewal note and the original $5,000 note was returned to defendant marked, "Cancelled upon renewal." This in itself constituted the giving of value. In *Elgin Nat. Bank v. Goeke,* 295 Ill. 403, it was held that an indorsee who takes a note as collateral security for a pre-existing debt is a taker for value, and in *Zollman v. Jackson Trust & Savings Bank,* 238 Ill. 290, the court held that the substitution of a note for other collateral constitutes the giving of value. Moreover, this transaction as reflected in the books of the bank, as hereinbefore described, shows that the bank gave sufficient value for the note to support recovery thereon.

In view of the conclusions herein expressed the judgment of the superior court should be reversed and it is so ordered. Judgment is entered here in favor of plaintiff and against defendant for the face amount of the note, $4,074, together with interest at 6 per cent from January 6, 1938, to date, and the costs of suit.

*Judgment reversed and judgment here for plaintiff and against defendant as indicated.*

SULLIVAN, P. J., and SCANLAN, J., concur.