Corn Belt Bank of Bloomington, Illinois, Defendant in Error, v. Louie Forman, Plaintiff in Error.

Gen. No. 8,556.

590

Opinion filed February 1, 1932.

WHITMORE & WHITMORE and WILL F. COSTIGAN, for plaintiff in error.

W. R. BACH and PRATT, HEFFERNAN & RAMSEYER, for defendant in error.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

On June 28, 1930, the Corn Belt Bank of Bloomington, Illinois, defendant in error, took judgment by confession for the sum of $35,406.25 in the circuit court of McLean county. The judgment was entered by virtue of three judgment notes each dated December 27, 1929, two for the principal sum of $10,000 each and one for the sum of $11,250. Each was payable six months after date with interest at the rate of six per cent per annum from date and each was payable to the order of Bodman Tractor & Equipment, Inc.

Each note bore on its face in writing the following legend: "This note is non-negotiable except as collateral security at the Corn Belt Bank of Bloomington, Illinois, or The Caterpillar Tractor Co. of East Peoria, Illinois," and each note was indorsed on the back, "Bodman Tractor & Equipment, Inc. by S. W. Bodman Pres." For convenience and brevity, defendant in error will hereinafter be referred to as the Bank and plaintiff in error by his own name.

On motion of Forman the judgment against him was opened up, he was granted leave to plead and the judgment ordered to stand as security for the debt. Many pleas were filed at different times before the trial. To a number of them demurrers thereto were sustained by the court and additional pleas filed and further additional pleas filed from time to time. The pleas themselves as filed bore no identifying numbers. Lack of time and space prohibits the setting out of these pleas in *haec verba,* but as counsel for Forman in their statement of the case attempts to abstract and identify them, we adopt his statement in regard thereto which is as follows:

"The first plea was verified by Forman and alleged that 'Bodman Tractor & Equipment, Inc., did not assign, indorse or deliver any of the said supposed promissory notes and warrants of attorney in said declaration and the several counts thereof mentioned, to the said Corn Belt Bank, plaintiff herein, in manner and form as plaintiff has above in that behalf in its said declaration alleged.'

"The first additional plea, also verified by Forman, denied the execution of the supposed promissory notes and warrants of attorney in manner and form declared upon.

"The second and third additional pleas aver want of consideration and lack of good faith on the part of The Bank by knowledge of and participation in the fraud on Forman and Bodman Tractor & Equipment, Inc.

"The fifth additional plea sets up the fraud practiced by Bodman in obtaining the notes from Forman and alleges bad faith of The Bank.

"The sixth additional plea avers an illegal consideration in that the notes were given for shares of the initial issue of capital stock of Bodman Tractor & Equipment, Inc., a Delaware corporation, in direct violation of the Constitution and corporation law of Delaware and alleges The Bank's knowledge of the same prior to the time it acquired the notes.

"The seventh additional plea pleads total failure of consideration and recites that the notes were given in consideration that the payee would carry out the provisions of a certain resolution duly adopted at the first meeting of the board of directors of the corporation, authorizing the president to purchase in the name of the corporation and under its corporate seal the assets of the Illinois Road Equipment Company upon the approval of the list of assets being furnished to said board of directors and upon the condition that the assets be delivered free and clear of any accounts payable or notes payable; that Bodman Tractor & Equipment, Inc., the said payee, did not purchase or acquire any assets of said Illinois Road Equipment Co. whatever, but, on the contrary, the notes were put up as collateral security with The Bank and the money thus raised on said notes was illegally and wrongfully used in payment of a small part of the debts of the Illinois Road Equipment Co. The plea further alleges the bad faith of The Bank, knowledge of and participation in the diversion of the funds. Counsel for The Bank craved over of the minutes of the first meeting of the board of directors referred to in plea and oyer was granted by Forman's counsel.

"The first further additional plea avers negotiation in breach of faith; alleges delivery of the notes on condition that they might be used as collateral security at The Bank or the Caterpillar Tractor Co. for the use and benefit of the payee corporation and for

no other purpose; that the payee did not use the notes as collateral security for the use and benefit of Bodman Tractor & Equipment, Inc., or for any corporate purpose, but in violation of the condition upon which the notes were delivered to it, used said notes to raise money to pay upon the debts of another corporation, including $5,000 to The Bank, for which neither Bodman Tractor & Equipment, Inc., nor Forman was in any way obligated and from which payment Bodman Tractor & Equipment, Inc., received no benefit or anything of value; that plaintiff bank participated in diverting said moneys by receiving a direct benefit from part of said diversion and by aiding in a diversion of the remainder of the funds with actual knowledge that Bodman was diverting the funds of the payee corporation and Forman.

"The second further additional plea pleads failure of consideration in that the notes were given in consideration that payee, Bodman Tractor & Equipment, Inc., was legally licensed to transact business in Illinois, in compliance with a resolution passed at the first meeting of its board of directors on December 5, 1929; that the officers of said corporation should obtain such license; that the supposed president and secretary, without Forman's knowledge, aided and abetted by Ralph J. Heffernan as the duly designated attorney of the corporation and a director of and attorney for The Bank, prepared and filed a verified false and fraudulent report to the Secretary of State of Illinois; that the license issued on said fraudulent report was null and void; further alleges bad faith of The Bank in taking the notes.

"The third further additional plea avers that the inscription written across the face of each note, 'This note is nonnegotiable except as collateral security at the Corn Belt Bank of Bloomington, Illinois, or the Caterpillar Tractor Co. of East Peoria, Illinois,' restricted the indorsement of each of the notes and ren-

dered them nonnegotiable so that The Bank could not maintain this suit in its own name.

"Demurrer was sustained to this plea, which plaintiff in error contends was erroneous under the law cited in III-A of the brief.

"The fourth further additional plea recites that $1,000 was the minimum amount of capital with which the corporation could commence business, the payment of which into the treasury was a condition precedent to its right to engage in business, including the right to use Forman's notes as collateral for any purpose; further avers that at the time Forman's notes were indorsed and put as collateral with The Bank, $1,000 had not been paid into the treasury on its capital stock wherefore it could not engage in its corporate business, which The Bank then and there knew.

"The fifth further additional plea is a plea of ultra vires. It avers the payee corporation had no power or authority under its charter, by-laws or under the general law under which it was incorporated to pledge its property for the payment of the debts of another person, firm or corporation; that said notes were pledged to The Bank to obtain money solely to pay on debts of Illinois Road Equipment Co., which were not the debts of Bodman Tractor & Equipment, Inc., and which it was under no obligation to pay. All of which facts it is averred were then and there well known to The Bank.

"The sixth further additional plea avers an illegal consideration that Forman's notes were obtained from him for 250 shares of the initial issue of capital stock of Bodman Tractor & Equipment, Inc., the issuance of which stock for said promissory notes being in direct violation of the Illinois Corporation Act under which it was represented the said corporation would be licensed as a foreign corporation; that The Bank had actual knowledge of those facts.

"Plaintiff in error contends that the trial court erroneously sustained demurrer to this plea, as under

sec. 84, Ill. Corp. Act, foreign corporations are subject to same restrictions as domestic corporations and under section 28 promissory notes are prohibited as payment for stock.

"The seventh further additional plea sets out in *haec verba* the collateral note evidencing the loan for which Forman's notes were taken as security and the special contract in said notes which provides for authority to sell the Forman notes on nonpayment of the principal note at public or private sale, but which makes no provision for authority to confess judgment on them; the plea avers that Forman's notes were never sold under said contract and that The Bank's sole right and interest in Forman's notes is as collateral security under the contract set forth; that The Bank had no power to sue in its own name.

"Plaintiff in error contends that the court erroneously sustained demurrer to this plea, as there cannot be an express and implied contract for the same thing. The express mention of one remedy excludes the other.

"On June 10, 1931, Forman filed the general issue and a further additional plea which avers that Forman's notes were given for 250 shares of the 1,000 initial shares of the capital stock of Bodman Tractor & Equipment, Inc., authorized and fixed by its charter, upon condition that said notes were not to take effect until all of said 1,000 shares were subscribed and the corporation had received the $1,000 fixed as the minimum amount of capital with which the corporation could commence business; that the notes were accepted upon said terms and conditions; that at the time The Bank took said notes Bodman Tractor & Equipment, Inc., had not complied, and in fact never did comply, with said conditions, but only 504 shares of the 1,000 shares were ever subscribed and not one dollar had been paid into the treasury of the corporation; therefore, the notes never became a legal obligation of Forman; that Bodman negotiated the notes in fraud of

Forman's rights and in breach of faith before the conditions upon which they were delivered had been complied with.

"Demurrer was sustained to this plea because of failure to aver The Bank's knowledge of the facts pleaded and because of failure to deny that The Bank was a holder in due course. Plaintiff in error then filed a further additional plea, which was the same as the above with the addition of scienter, but contends that under sec. 59 of the Negotiable Instruments Act (Cahill, ch. 98, par. 79) the scienter was not necessary.

"Finally further additional pleas were filed, the same, in substance, as the fifth and seven additional pleas, except that in each plea the averment of an express consideration that The Bank would receive out of the loan $5,000 is changed to the averment that The Bank did receive out of said loan $5,000."

The trial was had before the court without a jury and the court found the issues for the Bank except as to the sum of $1,416.25 and ordered that the judgment theretofore rendered should remain in full force and effect except as to that sum which the clerk was directed to credit on the original judgment.

The three notes on which the judgment was entered were delivered to the Bank as collateral security for a judgment note dated January 3, 1930, executed by Bodman Tractor & Equipment, Inc. by S. W. Bodman, president, and Vann D. Wilder, secretary and treasurer, in the principal sum of $30,000 payable 90 days after date to the order of the Bank. To this note was attached an agreement that the Bank had complete authority to sell said collateral or any part thereof at public or private sale without notice to the maker and apply the proceeds of any such sales to the payment of said note including all interest due thereon together with costs, attorney's fees and expenses attending any such sale.

It is contended by counsel for appellant that the collateral notes of Forman were obtained from him by

Bodman as president of the Bodman Tractor & Equipment, Inc. by fraud and that there were certain other infirmities pertaining to the execution of the note of all of which the Bank had notice. The court held as a proposition of fact that the Bank in receiving said notes as collateral security acted in good faith. Without discussing the evidence in detail, but after a very careful consideration thereof, we hold that the manifest weight of the evidence supports this finding of the court and that the Bank had no· knowledge either actual or implied of any such fraud or of any of the alleged infirmities in the notes.

At the close of plaintiff's case in chief, Forman made a motion to find the issues in favor of himself and the refusal of the court to sustain the motion is assigned as error. The basis of this contention is (a) that the verified plea denying the indorsement of the notes made it necessary for the Bank to prove that Bodman as president of the Bodman Tractor & Equipment, Inc. had authority to indorse the collateral notes; and (b) that the verified plea denying the delivery of the notes also put the burden on the Bank to prove as a part of their case in chief a delivery to the payee of the notes sued on and that there was no proof of either the authority of the president to indorse the notes nor of the delivery of them to the payee therein and consequently the Bank did not make out a prima facie case. It has long been held by the courts of this State that when a contract, properly executed for a corporation by its president, is such as the corporation might lawfully make, proof of the execution by the president thereof is all that is required, in the absence of proof showing want of authority to make the contract. *Green v. Ashland Sixty-third State Bank,* 346 Ill. 174; *Bloom v. Vehon Co.,* 341 Ill. 200; *Quigley v. McQueen & Co.,* 321 Ill. 124. In the case of *Lloyd & Co. v. Matthews,* 223 Ill. 477, it was held:

"It is contended that even though it be conceded that George E. Lloyd & Co., by E. C. Williams, its

president, signed the guaranty, still, as a matter of law, the corporation cannot be held liable without proof of special authority from the corporation to its president to execute the contract of guaranty. A corporation can act only through its agents, and the president of a corporation, as the agent and corporate representative, has the power, in the ordinary course of business and in furtherance of the corporate interests, to execute contracts and to bind the company in so doing. He is, by virtue of his office, recognized as the business head of the company, and any contract pertaining to the corporate affairs, within the general powers of such officer, executed by the president on behalf of his corporation, will, in the absence of proof to the contrary, be presumed to have been done by authority of the corporation. (*Atwater v. American Exchange Nat. Bank,* 152 Ill. 605; *Bank of Minneapolis v. Griffin,* 168 id. 314; *Anderson v. South Chicago Brewing Co.,* 173 id. 213; *Anderson Transfer Co. v. Fuller,* 174 id. 221; *Williams v. Harris,* 198 id. 501.) If the contract in question had been executed by some agent who ordinarily does not have the power to sign such instruments, and the execution had been put in issue by properly verified plea, as is the case here, then it would be necessary to go beyond the mere fact of the execution of the instrument and prove the authority of the agent to execute the same; but when the contract is properly executed for the corporation by its president and it is such a contract as the corporation might lawfully make, the proof of the execution by the president is all that is required, in the absence of any evidence to the contrary showing that the contract was not made by the authority of the corporation.

"In support of its contention that special authority in the president to sign this guaranty must be shown, the appellant cites and relies upon *Dobson v. More,* 164 Ill. 110; *Park Hotel Co. v. Fourth Nat. Bank,* 86 Fed. Rep. 746; *National Park Bank v. German American Mutual Warehousing and Security Co.,* 116

N. Y. 281, and some other cases of like character. Language can be found in these cases, and perhaps in others, which, when considered alone and disconnected from the facts of the case wherein it is employed, seems to sustain the contention of appellant that in order to make a contract binding upon a corporation which has been executed by the company through its president, a resolution of the board of directors or a vote of the stockholders, or other special authority, must be shown where the execution of the instrument is put in issue by a verified plea. Upon a careful examination of these cases it will be found that they are clearly distinguishable from the case at bar, in that the president, in the execution of the contracts, was using the credit of the corporation to serve his own private interests or that of some third party.''

It was also held in the cases of *Frye v. Tucker,* 24 Ill. 180, 181 and *Goodrich v. Reynolds, Wilder & Co.,* 31 Ill. 490, that the assignment of a note by the president of a corporation was prima facie the act of the company by its authorized officer. We are, however, of the opinion that the evidence does in fact tend to prove that the president of the Bodman Tractor & Equipment, Inc., had power to indorse the notes in question on behalf of the corporation. This corporation was organized under the laws of Delaware and in accordance with its charter, which was introduced in evidence, had the following powers:

''To build, erect, construct, purchase, hire or otherwise acquire, buy, sell, own, dispose of, provide, establish, maintain, hold, lease and operate factories, warehouses, agencies, buildings, structures, offices, houses, works, machinery, plants, terminals and other buildings and structures, and all other property and things of whatsoever kind and nature, real, personal and mixed, tangible and intangible, including good will, within and without the State of Delaware, and in any part of the world, suitable, necessary, useful or advis-

able in connection with any of the objects hereinabove or hereinafter set forth.'' Among these objects set forth were the following:

9. ''To acquire, and pay for in cash, stock or bonds of this corporation or otherwise, the good will, rights, assets and property, and to undertake or assume the whole or any part of the obligations or liabilities of any person, firm, association or corporation.''

10. ''To acquire, hold, use, sell, assign, lease, grant licenses in respect of, mortgage or otherwise dispose of letters patent of the United States or any foreign country, patent rights, licenses and privileges, inventions, improvements, processes, copyrights, trade marks and trade names, relating to or useful in connection with any business of this corporation.''

11. ''To guarantee, purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of the capital stock of, or any bonds, securities or evidences of indebtedness created by any other corporation or corporations organized under the laws of this State or any other State, country, nation or government, and while the owner thereof to exercise all the rights, powers and privileges of ownership.''

12. ''To enter into, make and perform contracts of every kind and description with any person, firm, association, corporation, municipality, county, state body politic or government or colony or dependency thereof.''

13. ''To *borrow or raise moneys* for any of the purposes of the corporation and, from time to time, without limit as to amount, to draw, make, accept, *indorse,* execute and issue promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to *secure the payment of any thereof, and of the interest thereon by mortgage upon or pledge,* conveyance or assignment in trust *of the whole or any part of the property of the*

*corporation,* whether at the time owned or thereafter acquired and to sell, pledge or otherwise dispose of such bonds or other obligations of the corporation for its corporate purposes.''

It will thus be seen that under the charter powers of the corporation it had the power to borrow money and to pledge its property therefor and that the indorsements of the notes in question were within the charter powers of the corporation.

The Bank also introduced in evidence as a part of its case in chief certain of the by-laws, among which are the following in regard to the powers and duties of the president:

30. ''The President shall be the chief executive officer of the corporation; he shall preside at all meetings of the stockholders and directors. *He shall have general and active management of the business of the corporation,* and shall see that all orders and resolutions of the board are carried into effect.''

31. ''He shall execute bonds, mortgages and other contracts requiring a seal, under the seal of the corporation.''

32. ''He shall be *ex officio* a member of all standing committees, and shall have the *general powers and duties of supervision and management usually vested in the office of president of a corporation.''

The following by-law was also introduced in evidence:

46. ''All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the board of directors may from time to time designate.''

There was no by-law authorizing any officer to indorse notes. Commercial transactions must be construed in accordance with commercial usage. Under the laws of this State as shown above in accordance with commercial usage, the president of a corporation who, by the by-laws thereof is impressed with the duty

of the general and active management of the business of the corporation, has the right to indorse notes of the corporation unless such right is restricted by the by-laws of the corporation. The by-laws of the Bodman Tractor & Equipment, Inc., specifically state that the president shall have the general powers and duties of supervision and management usually vested in the office of president of a corporation. There was no by-law authorizing any particular officer of the corporation to indorse notes nor was there any by-law prohibiting the president from doing so. The Bodman Tractor & Equipment, Inc., was a trading corporation and of necessity in the carrying on of such business some officer must be invested with the power to indorse notes, and therefore, the showing that the by-laws did not restrict this authority to any particular officer, was proof that the president had power to do so in accordance with the usual powers of presidents of such corporations.

By the second contention made under this assignment of error that, as the execution of a promissory note includes the delivery thereof to the payee, the burden was on the Bank to prove such delivery under the verified plea denying the execution of the notes, we do not understand that it is meant that before the Bank could recover it was incumbent upon it, because of this verified plea, to prove a manual delivery of the notes by the maker to the payee. To hold that such was the law would establish a defense which very few indorsees could overcome and would practically destroy the negotiability of such instruments. We believe that section 16 of the Negotiable Instruments Law (Cahill's St. ch. 98, ¶ 36) was meant to cover just such cases. This section provides: "But where the instrument is in the hands of a holder in due course, a valid delivery thereof by all parties prior to him so as to make them liable to him, is conclusively presumed." Counsel say in their argument: "The purpose of filing

the verified plea denying execution of the notes was to compel the Bank to show the fact that the notes were delivered conditionally.'' Of course no such duty involved upon the Bank. Forman, however, did not elect to abide by his motion made at the close of the Bank's evidence, but proceeded to introduce evidence to show that the delivery was but conditional, in that the notes were not to be binding under the law until all the capital stock of the corporation was subscribed for and until the minimum of $1,000 was paid in, which was required to commence business, and that they were to be used only as collateral for temporary financing of the purchase by the Bodman Tractor & Equipment, Inc. of tractors, equipment, etc., if need be. The evidence on which counsel relies to establish these facts consists of the testimony of Forman. On direct examination he testified as follows in regard to these matters:

Q. Coming down to the time when the notes were given, and when the stock was issued, when did that transaction take place?

A. December 27, 1929.

Q. Was there any conversation of any kind or anything said between you and Bodman, between the time of this meeting of December 5th, 1929 that was held at Heffernan's office, and the time when the stock was issued and your note signed?

A. I saw Bodman two or three times between December 5th and December 27th.

Q. What was said, or how did you get together on the question of issuing the stock?

A. Mr. Bodman called me up and said to come down, ''Come down and we will issue some stock today.'' And I went down about noon. We talked the matter over and he gave me a certificate of stock.

Q. You may look at the paper now shown you marked for identification Defendant's Exhibit B and

state whether or not that is the certificate that you acquired at that time?

A. Yes, sir.

Q. That is numbered, Certificate Number One?

A. Yes, sir.

Q. Was there any other certificate issued there at that time?

A. I did not see any issued.

Q. Now did you execute or sign any notes there at that time as a part of that same transaction?

A. Yes, sir.

Q. Are these the notes, marked Plaintiff's Exhibits two, three and four?

A. Yes, sir.

Q. State what was said there at that time about these notes and what the Bodman Tractor and Equipment Incorporated was to do with these notes.

A. I first said I was going to write, "This note is non-negotiable."

Q. What was said?

A. I told Mr. Bodman I would write across the face of the note, "This note is non-negotiable." And we talked about it for a while and he suggested that I make it so that it could be used at the Caterpillar Tractor Company or Corn Belt Bank in case it was needed for temporary financing.

Q. Financing whom?

A. Bodman Tractor and Equipment Incorporated.

Q. What if anything was said there at that time with reference to when the Bodman Tractor and Equipment Incorporated would engage in business?

A. When enough stock was sold to take over the Illinois Road Equipment Company.

Q. How much stock in the Bodman Tractor and Equipment; Incorporated was to be disposed of or subscribed for?

A. How much stock was—

Q. How much stock was to be disposed of before they started to do business, if that was discussed.

A. As many shares as was necessary to take over the equipment and stock in trade and tractors and parts of the Illinois Road Equipment Company, free from debt.

Q. When was this writing across the face of each one of these notes put on the notes?

A. Before I gave them to Mr. Bodman.

Q. Now, Mr. Forman, what if anything was said there with reference to when these notes, or how these notes were to be used?

A. These notes were to be used at the Corn Belt Bank or the Caterpillar Tractor Company to pay for tractors as they were shipped to the Bodman Tractor and Equipment Incorporated and then, as the tractors were sold the money was to be paid in and these notes were simply to act as temporary financing for the Bodman Tractor & Equipment Incorporated.

Q. Now, Mr. Forman, you may state what if anything was said with reference to the matter of when and how the Illinois Road and Equipment Company and in what condition it was to be taken over.

A. It was to be taken over when the Bodman Tractor & Equipment Company had enough money to take it over, free from debt.

Q. Was anything further said with reference to whether it would be in time for the business—

Q. Anything said as to the date they were to begin business.

A. Mr. Bodman said we could not begin business until we had sold some more stock.

Q. What was said?

A. About taking over the business.

Q. Yes.

A. We would take it over as soon as there was enough stock sold so that we could get the Spring

Trade. That was my understanding of it. It was the cream of the business. The Townships were buying tractors then and the farmers would be in the market.

Practically all the above questions were objected to as being leading, suggestive and but conclusions of the witness. The court permitted them to be answered subject to the objections on the ground that it was a hearing before the court without a jury and only such evidence as was competent would be considered. The above testimony of Forman is but pure conclusion of the witness and does not sustain the contention of counsel that any such conditions controlled the execution of the notes by Forman, and even if they did that the bank had knowledge thereof. This testimony was incompetent and cannot be considered.

It is also claimed that these collateral notes of Forman were given by him in payment for the stock issued to him September 27, 1929, and that under the laws of Delaware stock could not be paid for by notes. The abstract does show that Forman testified: ''The notes were given for the stock issued September 27, 1929.'' On reference to the page of the bill of exceptions noted in the abstract where this testimony should appear it does not show that any such testimony was given by Forman. On the contrary, before the latter executed the collateral notes he entered into a contract with Bodman reciting that for and in consideration of said Forman purchasing 250 shares of the capital stock of Bodman Tractor & Equipment, Inc., for $31,250 *and paying cash therefor into the treasury of the company,* the said Bodman agrees, on June 27, 1930, upon request of and at the option of the said Forman, repurchase from him 100 shares of said stock for the sum of $12,500 in cash, in case said Forman elects at that time to sell said 100 shares of stock, and that Bodman further agrees that in case said Forman

does sell to him the said 100 shares of stock of said Forman desires to repurchase said 100 shares of stock, or any portion thereof, said Bodman will, upon request, at any time up to June 27, 1932, resell to said Forman all or any portion of said stock at the price of $125 per share, plus 6 per cent annual interest during the period the said Bodman shall have held said stock after his repurchase thereof from said Forman, up to and until the said Forman exercises his option and repurchases said stock as hereinabove provided. Pursuant to this contract Bodman executed a promissory note payable to Forman for $12,500 due in six months and bearing the notation, ''Guarantee of earning of 25 per cent on stock of Bodman Tractor & Equipment, Inc., on June 28, 1930.'' In addition to the statement of Forman on his direct examination that he made the notes for temporary financing of the Bodman Tractor & Equipment, Inc., he also testified, on cross-examination, that the notes were given to aid in the sale of stock and his credit and the fact that he was in the company might have something to do with selling other stock, and that he had agreed with Bodman that when the company bought tractors from the Caterpillar Tractor Co. or when tractors were shipped to it with sight drafts, as those tractors were sold the money was to be paid on the notes, to clear his notes. Whatever construction may be placed upon the inconsistent and contradictory testimony of Forman in this connection, it is apparent that he executed the notes in question for the express purpose of being used as collateral security at the bank or the Caterpillar Tractor Co. for the benefit of the Bodman Tractor & Equipment, Inc.

It is claimed by counsel for Forman that the legend written on the notes by Forman made them non-negotiable and therefore the Bank was charged with notice of all the infirmities thereof. The fact that the negoti-

ability of the notes was restricted by the maker does not make them non-negotiable insofar as they are negotiated within such restrictions. Promissory notes are but contracts and by inscribing the legend on the face of the notes Forman specifically authorized the payee to negotiate the notes with the Bank. Insofar as the Bank was concerned these notes were negotiable.

It is further contended by counsel for Forman that the court erred in sustaining the demurrer to what is designated as the seventh further additional plea. The collateral agreement attached to the original note gives to the Bank or its assigns authority to sell said collateral or any part thereof at the option of said Bank or its assigns on the nonpayment of the original note at its maturity, at public or private sale, without advertising, etc., and to apply the proceeds of any such sale to the payment on the original note, and it is argued that because this collateral agreement does not authorize the Bank to take judgment on the collateral notes it had no authority to do so; that the Bank is bound by that contract and not by the law, that the disposition of the collateral notes must be according to the contract and that the Bank was restricted in the collection of the collateral notes to the sale thereof under the doctrine *expressio unius est exclusio alterius.* Under the common law the pledgee of collateral security had no right to sell the same, without judicial process, unless he gave the pledgor reasonable notice to redeem, also of the pledgee's intention to sell, and of the time and place of such sale, but an agreement attached to the note or pledge that the same may be sold without notice gave the pledgee the right to make such sale. *McDowell v. Chicago Steel Works,* 124 Ill. 491. However, it has always been held that the pledgee has the right to collect his debt and to sue and take judgment upon collateral notes regardless of whether he had a right to sell them.

In the case of *Peacock v. Phillips*, 247 Ill. 467, this rule is very clearly stated as follows:

''A creditor holding goods, chattels or tangible personal property as a pledge to secure the payment of· the indebtedness to him may sell the same and apply the proceeds to the payment of his debt, accounting to his debtor for any surplus. (22 Am. & Eng. Ency. of Law,—2d ed.—882.) From the nature of the property the only method of applying it to payment of the debt is through a sale, but it is not so with bonds, mortgages or promissory notes, which are available for the payment of the principal debt by collecting them and applying the proceeds. (*Joliet Iron and Steel Co. v. Scioto Fire Brick Co.*, 82 Ill. 548; *Union Trust Co. v. Rigdon*, 93 id. 458.) In *Jenkins v. International Bank*, 111 Ill. 462, where notes and a mortgage were pledged to the bank, it was said that a creditor holding such securities has three remedies, and may file his bill to have the collaterals sold for the payment of the principal indebtedness, *or may bring suit upon the collaterals themselves,* or collect the same by a sale of property conveyed in trust to secure them. The creditor, in the absence of a power of sale given him by his debtor, cannot sell commercial paper or choses in action, *but may collect the same and apply enough of the proceeds to pay his debt,* and if there is any balance, must return it to the pledgor. (*Zimpleman v. Veeder*, 98 Ill. 613.) If the collateral security consists of a mortgage, the holder of it has a right to foreclose (*Union Trust Co. v. Hasseltine* (Mass.), 16 Ann. Cas. 123, note), and in such case must account for any surplus above his debt. (31 Cyc. 888.) If the securities of a third person are deposited as collateral, the creditor *may collect* the whole amount due from the maker and will hold any surplus above his own debt as trustee for his debtor, and in such a case the maker of the securities is not concerned how

the pledgor and pledgee should settle between themselves but is held for the full amount of his debt.''

Another rule, to which we have been unable to find any exception, is that a provision in an agreement giving the holder of collateral securities the right to sell the collateral on default in payment of the debt, instead of restricting the rights of the creditor, enlarges the same. Thus it was held in the case of *Farmers' & Merchants' Bank of Stockton v. Copsey,* 134 Cal. 287, 66 Pac. 324: ''Appellants' main contention is that the plaintiff had no right to foreclose the Beckman note and mortgage by judicial sale, for the reason that the assignment authorized plaintiff to sell the note and mortgage. It is said the note and mortgage were held by the plaintiff as pledgee, and that the defendants, as pledgors, had authorized a sale, and therefore this method only should have been pursued. We think the authority was given for the benefit of the pledgee,—the plaintiff,—and was not exclusive. Where a special power is given to sell negotiable paper taken as collateral security upon default in the payment of the debt, the power is not exclusive. It is considered in law as given, not for the purpose of restricting or curtailing the rights of the pledgee, but for the purpose of enlarging his rights, making the pledge more advantageous to him by giving him a more effectual and speedy means of obtaining money from his security. He may in such case bring an action in equity to foreclose the security. Jones, Pledges, sections 645, 651; *McArthur v. Magee,* 114 Cal. 129, 45 Pac. 1068.'' And the Supreme Court of West Virginia in the case of *Flat Top Nat. Bank v. Parsons,* 90 W. Va. 51, 55, 110 S. E. 491, in passing upon this same question said:

''(3) Third. It is contended by defendant that the plaintiff acquired no title, either legal or equitable, to the note sued on, and therefore had no right to maintain this suit upon it, claiming that the only remedy

plaintiff had was to sell the note, according to the terms of the note executed to the plaintiff by Benton. The defendant claims that the express provisions of the note of Benton to the bank, providing for a sale of the collateral in case of nonpayment of Benton's note at maturity, was the exclusive and only remedy of the Bank, so far as the collateral deposited therewith was concerned. We cannot agree with this view; this suit was properly brought by the plaintiff. The note in suit was indorsed by the payee, Benton, and delivered to the plaintiff; it being a negotiable note, title thereto passed to the plaintiff; suit could not be maintained thereon by Benton in his name so long as title remained in the plaintiff, and it was the right of the plaintiff, if not its duty, to collect the note by suit.''

The doctrine *expressio unius est exclusio alterius* has no application to collateral contracts of this character. The Bank had a right to collect the debt by suing on the collateral notes and take the judgment thereon.

It is contended also that the collateral notes of Forman are void because a full subscription to the stock was a condition precedent to the company to begin business. Section 60 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 80, is as follows:

''60. The maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to indorse.'' Forman took an active part in the organization of the Bodman Tractor & Equipment, Inc. He was a director and vice president thereof and as such knew that the company was organized under the laws of the State of Delaware and that it had petitioned for and received from the Secretary of State of Illinois a certificate to do business in this State. He took and introduced Bodman to a prospective stockholder in order to induce the latter to subscribe for stock in the company. He personally used his in-

fluence with the Caterpillar Tractor Co. to persuade the latter to extend the contract theretofore enjoyed by the Illinois Road Equipment Co. to the Bodman Tractor & Equipment, Inc. He attended the meetings of the directors and he himself of his own volition and in his own handwriting indorsed the legend on the face of his notes. At different times he testified, "It was understood that if I gave these notes they were to be used simply as temporary financing for the Bodman Tractor & Equipment, Inc."; "The notes were given to aid in the sale of stock. It was necessary to sell all of the stock of the company and my credit, and the fact that I was in the company might have had something to do with selling other stock"; "My name would help along in the sale of stock after so many shares were subscribed and paid for." Howell, the president of the Bank, testified, "He said (meaning Forman), 'Haven't you my notes in here?' We went up into the bank room and he said that the notes would be due before long and it did not look like he would be able to pay the notes without inconvenience to him and asked if he might renew the notes." McElheny, the cashier, testified, "Mr. Forman asked if it would be possible to renew the notes when they became due and asked for a quiet talk."

Under all the principles of honesty, good faith and fair dealing, a person who helps to procure the incorporation of a company in a foreign State and helps to procure a certificate from the Secretary of State of this State authorizing it to do business in this State and executes his notes for the purpose of enhancing the credit of the corporation and to induce the public to buy its stock, and the notes are acquired by a bank as collateral security for a note of the corporation by which the bank gave credit to the corporation for a large amount of money, such notes being executed for the express purpose of having the same accepted by that particular bank as collateral for the purpose of

temporary financing of said corporation, should be estopped and is estopped from questioning the validity of the corporation.

The manifest weight of the evidence shows that the Bank accepted these collateral notes of Forman in good faith and for value. Only bad faith will defeat the title of the pledgee to commercial paper taken before maturity, for value, and without knowledge of any defense thereto. Mere suspicion, the knowledge of circumstances calculated to excite suspicion, or even negligence of the pledgee in acquiring the paper, will not defeat his title. *Kavanagh v. Bank of America,* 239 Ill. 404; *Bradwell v. Prior,* 221 Ill. 602.

Several other defenses have been presented as to the validity of the notes in question which we do not deem necessary to mention as the evidence so manifestly proves that the Bank was the holder of these notes in due course that they are without merit.

At the close of the evidence counsel offered 38 propositions of law. The court refused to mark them "Held" or "Refused" and made the following notation: "All of these propositions are refused. They are too numerous. Such of them as are proper are covered by propositions prepared by the Court and marked 'Held.' " The court then of its own motion prepared and marked "Held" 7 propositions of fact and 14 propositions of law which cover every question raised in the case necessary to be considered. If there was any error in refusing to mark the propositions of law tendered by Forman, it was harmless.

The question before this court ought to be and is whether the judgment rendered by the trial court is right under the evidence and the law. In our opinion the judgment of the trial court is in accordance therewith and it is therefore affirmed.

*Affirmed.*