F. W. McRoberts, Receiver of First National Bank of Nebo, and First National Bank of Nebo, Defendants in Error, v. G. A. Minier et al., Plaintiffs in Error.

Gen. No. 8,655.

1

2

Opinion filed January 16, 1933. Rehearing denied April 5, 1933.

FRANK A. WHITESIDE, L. T. GRAHAM, NOAH GULLETT, HOOPES & PEFFERLE and GILLESPIE, BURKE & GILLESPIE, for plaintiffs in error.

WILLIAM and BARRY MUMFORD, for defendants in error.

MR. PRESIDING JUSTICE ELDREDGE delivered the opinion of the court.

The bill in this case was originally brought by the First National Bank of Nebo, Illinois, but after the bill was filed the bank went into the hands of a receiver who has been made a joint party complainant. The

object of the bill, which has been amended several times, was to enforce a stockholder's liability for an alleged debt due the National Bank by the Minier State Bank of Nebo. The origin of this controversy grows out of the following agreement:

"THIS AGREEMENT Made and entered into this February 5, A. D. 1925, by and between the First National Bank of Nebo, Illinois, by J. T. Harvey, William Franklin, F. J. Sitton, Neal Sutton, and J. W. Draper, its Board of Directors, of the first part, hereinafter called for brevity The National, and The Minier State Bank of Nebo, Illinois, by A. Wall, C. D. Borrowman, C. E. Swayne, J. H. Stark, Sr., and G. A. Minier, its Board of Directors hereinafter for brevity called The Minier Bank, WITNESSETH:—

"That Whereas, on January 2, 1925, said Minier Bank voted by its stockholders to consolidate its interests with said The National providing satisfactory arrangements could be made; and

"WHEREAS, On January 13, 1925, The National by its stockholders voted to accept said offer; and

"WHEREAS, The National hereby agrees to assume all liabilities of the depositors of The Minier Bank upon the transfer of a like amount of assets of said Minier Bank assigning said like amount of assets to The National; and the assigning of said assets shall carry with the same the usual legal liabilities of all said stockholders of said Minier Bank; and

"WHEREAS, it is further agreed by The Minier Bank further to transfer and assign all its other assets as additional security to and of said first mentioned assets herein agreed to be assigned;

"Said The National hereby agrees as soon as the same can be legally done to issue to the stockholders of The Minier Bank Fifteen Thousand Dollars in stock of said The National; and said Minier Bank stockholders agree to purchase said amount of stock at the

book value of the present stock of The National at the time of issuing the same;

"It is further agreed that said Minier Bank shall not in the future engage in the banking business at Nebo, Illinois.

"Signed, sealed and delivered in duplicate each of which shall be taken and held as an original on said above date.

"The Minier Bank of Nebo

A. Wall .......... (Seal)
C. E. Swayne .... (Seal)
J. H. Stark, Sr... (Seal)
C. D. Borrowman. (Seal)
G. A. Minier ..... (Seal)

The First National Bank of Nebo

F. J. Sitton .... (Seal)
Wm. Franklin .. (Seal)
J. T. Harvey ... (Seal)
Neal Sutton .... (Seal)
J. W. Draper ... (Seal)"

Prior to the execution of the above agreement, at a meeting held January 2, 1925, which was the annual meeting of the stockholders of the State Bank, a motion was made and carried to the effect that if satisfactory arrangements could be made, that bank consolidate with the National Bank of Nebo on such a basis and under such terms as might be later determined by the boards of directors of both banks. On January 6, 1925, the directors of the National Bank adopted a resolution "relative to the consolidation" of the State Bank with the National Bank as follows:

"Whereas: On the 2nd day of January, A. D. 1925, the shareholders of the Minier State Bank of Nebo at their Annual meeting held on said day, voted to *liquidate said Bank and to consolidate its interests* with the First National Bank of Nebo:

"Therefore be it resolved, that this Association assume the Liabilities of The Minier State Bank of Nebo, to its depositors, on the transfer of an equivalent amount of assets and for the purchase of assets representing shareholders' interests, to enable share-

holders with the proceeds, to pay for stock to be issued to them by reason of said consolidation: All assets transferred, both to secure liabilities of Depositors and assets purchased shall consist of only such notes and securities as are acceptable to the Board of Directors of this Association.''

At a meeting of the directors of the State Bank January 29, 1925, the following resolution was adopted:

''Therefore be it resolved that this Board of Directors accept the proposition made by The Board of Directors of the First National Bank of Nebo and hereby authorize A. Wall, President and Louie Melton, Cashier of this Bank to assign the cash and assets of this bank to The First National Bank for the purpose of consolidating the said banks on a basis of 150 shares of The First National Bank at one hundred and fifty dollars per share being issued to shareholders of the Minier State Bank as their interest may appear on records of said bank.''

Pursuant to the above resolutions the agreement hereinabove set out was executed by the two banks and their directors and on February 17, 1925, the cash and assets of the State Bank thought sufficient to secure the National Bank for the payment of all liabilities of the depositors of the State Bank were turned over to the National Bank. The total depositor liabilities of the State Bank was about $120,000. At this time the State Bank had about $25,000 in cash which they turned over to the National Bank and also turned over to the latter notes of the face value of $95,000 and other securities making a total of about $120,000 in compliance with the contract. When these notes and securities were turned over to the National Bank they were indorsed by the State Bank without any restriction or qualification. After this transfer of assets, notes and other securities had been made to

the National Bank, the State Bank had still in its possession about $40,000 of other notes which, under the contract, it had agreed to transfer and assign as additional security to the National Bank. The State Bank ceased doing business February 17, 1925. The National Bank proceeded to collect such notes and securities in due course which had been assigned to it as could be collected at maturity. Some of these notes were not paid at maturity and when this occurred they were renewed and made payable to the State Bank, indorsed by that Bank as the original notes had been indorsed and delivered to the National Bank. The State Bank in the meantime attempted to collect as much as possible of the $40,000 represented by the notes which it had retained after the assignment of its other assets to the National Bank. As these notes were collected the proceeds thereof were deposited in the name of the State Bank in a checking account in the National Bank. In the meantime the National Bank increased its capital stock by $15,000 and this additional stock, of the book value of $150 a share, was sold to such stockholders of the State Bank as cared to purchase it. The consideration for this stock was partly paid by A. Wall, president of the State Bank, on behalf of the stockholders thereof, out of the moneys received by the State Bank from the sale of its notes and other properties and which had been deposited by the State Bank in its checking account in the National Bank. About $15,000 had been received by the State Bank in this way. The total value of this additional stock of the National Bank was $22,500 and the additional $7,500 necessary to pay for the stock was collected from the stockholders of the State Bank personally who were buying stock in the National Bank though not all of the stockholders of the State Bank took stock in the National Bank. This stock, when paid for, was turned over to the president of the

State Bank and distributed by him to such stockholders of the State Bank as became purchasers thereof.

Whenever any of the notes which had been assigned to the National Bank became in default, the State Bank took them over from the National Bank and paid for them out of its account in the National Bank and the State Bank continued to pay off these defaulted notes as long as they had any money to do it with in compliance with their contract to turn over all its other assets as additional security. One of the notes held by the State Bank called the Schufelt note was defaulted. The State Bank paid the National Bank the amount due on the note, took a deed from Schufelt conveying to itself certain land embraced in a mortgage securing the note, held the land for a short time and then deeded it to a purchaser, said deed being .executed in the name of the State Bank by Arch Wall, president. The State Bank also entered suits in its own name in the circuit and county courts and before justices of the peace, held stockholders' meetings and also directors' meetings and continually carried a checking account in the National Bank and had such a deposit therein when this bill was filed. The particular notes for which the National Bank is seeking payment from the stockholders of the State Bank in this suit were all renewal notes executed by the makers thereof, payable to the State Bank, indorsed by that bank without restriction and delivered to the National Bank. These notes represented the same indebtedness which was due to the State Bank at the time the original notes had been indorsed over by it to the National Bank.

The chancellor entered a decree against the State Bank as an indorser and against the stockholders of said bank up to the par value of the stock held by them at the time said notes were given, finding that each of the five renewal notes was past due and owing from

the State Bank to the National Bank on the State Bank's indorsement of said notes and that the said several amounts represented by the respective notes are also due from the stockholders of the State Bank to the extent of the par value of their respective stock holdings.

Plaintiffs in error contend that the chancellor erred in rendering said decree because there was a consolidation of the State Bank with the National Bank thereby indicating clearly the intent of all the parties concerned that the indorsement made upon the orig-- inal notes should be merely for the purpose of transferring title thereto to the *consolidated bank;* that there was given no authority, implied or otherwise, to the officers of the State Bank to bind it by indorsement upon the original notes, or the renewal notes thereafter given; and, that even though the indorsement upon the original notes should be held valid and to have been made in pursuance of due authority, the original notes were paid by the execution of new notes to the National Bank which made all subsequent indorsements by the State Bank, accommodation indorsements, which the State Bank had no authority under the law to make, and which its officers were without power to execute.

It is contended by defendants in error that the transaction between the two banks was one of liquidation and not consolidation and that the State Bank retained its corporate existence and identity; that the State Bank and its stockholders are estopped from denying their liability because the State Bank retained its corporate identity, exercised corporate functions, and received benefits under a contract with the National Bank which was wholly executed by the latter, on the faith of their corporate responsibility for their debts; and, that as the State Bank was defaulted in this case and the bill taken as confessed against it,

therefore, the stockholders are estopped from denying their liability because their liability is based upon the liability of the State Bank.

It is very vigorously urged by counsel for plaintiffs in error that the written agreement entered into between the two banks was one of consolidation and that the banks were in fact consolidated. Corporations as such only have such powers as are granted to them by the sovereign power and their right to consolidate, if any, is derived solely from the sovereignty which has the power to grant their organization as corporations. *Chicago Title & Trust Co. v. Doyle,* 259 Ill. 489; *American Loan & Trust Co. v. Minnesota & Northwestern R. Co.,* 157 Ill. 641; *Morris v. Interstate Iron & Steel Co.,* 257 Ill. App. 613. The Banking Act of this State, Cahill's St. ch. 16a, grants to State banks the right to consolidate with each other and also with a national bank upon complying with certain conditions. National banks, however, are created by federal laws enacted by congress. The Federal Banking Act grants the power for two or more national banking associations located within the same county, city, town or village, with the approval of the comptroller of the currency, to consolidate into one association under certain enumerated conditions, but it gives no power or right to a national bank to consolidate with a State bank and if such power is withheld, it is regarded as a prohibition against the exercise of such power. *American Loan & Trust Co. v. Minnesota & Northwestern R. Co., supra.* It follows, therefore, that no consolidation in the sense that that word is construed in regard to corporations, between the National Bank and the State Bank was possible. It is clear, however, that the parties in their negotiations leading up to the agreement in question and in the agreement itself, inadvisedly used the words "consolidate" and "consolidation." In the agreement the National Bank agrees to assume

all the liabilities of the depositors of the State Bank upon the transfer of a like amount of the assets of the State Bank to the National Bank and the assigning of said assets shall carry with the same the usual, legal liabilities of all the stockholders of the State Bank. It also provides for the transfer of additional security to the National Bank by the State Bank and provides further that the State Bank shall not in the future engage in the banking business at Nebo. All of these provisions of the agreement are inconsistent with the idea that it was intended to be one of consolidation. Parties to a contract or agreement cannot change the character of a transaction by giving it a name inconsistent with the terms of the agreement itself. The effect of a consolidation of two or more corporations is the dissolution of the constituent companies. They cease to exist as legal entities. A new corporation comes into existence having all the property, rights, powers and franchises, and subject to all the duties and obligations of the constituent companies. *Southern Illinois Gas Co. v. Commerce Commission,* 311 Ill. 299; *Ohio & M. Ry. Co. v. People,* 123 Ill. 467; *People v. Louisville & N. R. Co.,* 120 Ill. 48; *Chicago Title & Trust Co. v. Doyle, supra; Scheidel Coil Co. v. Rose,* 242 Ill. 484; *Hiles v. C. A. Hiles & Co.,* 120 Ill. App. 617; *Morris v. Interstate Iron & Steel Co., supra.* Of course there can be no pretense that any new corporation was created. The proof also shows beyond dispute that the State Bank retained its identity and exercised many of its corporate functions for six years after this purported consolidation. It retained a large part of its assets, collected the same, took renewal notes, brought suits at law in the different courts in the State, took title to real estate in its own name and sold the same in its own name, indorsed notes payable to it in its own name, kept a checking account in its own name and continued to do all the

things necessary in winding up its affairs as a bank in its own name. In the case of *Southern Illinois Gas Co. v. Commerce Com., supra,* it was held:

"The effect of the consolidation of two or more corporations is to dissolve the original corporations and create a new one, and the new corporation thus organized is required to pay fees for its organization as a new corporation. *(Scheidel Coil Co. v. Rose,* 242 Ill. 484.) The appellant argues that the creation of the new corporation was for the purpose of purchasing the three old corporations and continuing the public service. A consolidation is not a purchase but is referred to in the statute as a merger. It has, perhaps, some of the qualities of a purchase, but it is a union of the rights and obligations of the original corporations which go out of existence and for which the single new corporation is substituted. It succeeds to all the property, rights, privileges, immunities, powers and franchises and every other interest which had belonged to the merging or consolidating corporations, or to any or either of them, as provided in section 70 of the Corporation Act. Also, by the next section all debts, liabilities and duties of the respective corporations upon the merger or consolidation attach to the single new corporation, and may be enforced against it to the extent as if such debts, liabilities and duties had been incurred or contracted by it."

Counsel for plaintiffs in error rely largely upon the case of *Chicago, S. F. & C. Ry. Co. v. Ashling,* 160 Ill. 373. In commenting upon the *Ashling* case the Supreme Court in the case of *Barnes v. American Brake-Beam Co.,* 238 Ill. 582, said:

"The decision in *Chicago, Santa Fe and California Railway Co. v. Ashling,* 160 Ill. 373, is not applicable to the facts of this case and does not tend to sustain the decree. In that case the Santa Fe company assumed the payment of the bonded indebtedness of the

St. Louis company and issued its stock dollar for dollar in exchange for stock of the St. Louis company, leaving that company without property, corporate rights or franchises of any kind and without stockholders. There was not even the skeleton of a corporation left and one company was merged and incorporated in the other.''

It is apparent that the facts in the case at bar are not similar or even analogous to those found in the *Ashling* case. There was not and could not have been a consolidation of the State and National Banks, nor does the agreement between them imply any sale of the assets of the State Bank to the National Bank. Our construction of this agreement is that it was one of liquidation whereby the National Bank took over certain assets of the State Bank for the purpose of paying the latter's liabilities to its depositors and reserving the usual, legal liabilities of the stockholders of the State Bank impressed thereon by the Constitution. The National Bank assumed no liabilities of the State Bank except those due the depositors thereof. Under this agreement any surplus of assets above what was necessary to pay the depositors of the State Bank would unquestionably inure to the benefit of the stockholders of that bank. The proofs show that the stockholders of the State Bank collected out of the assets of that bank, which under the contract it was agreed should be collateral security for the original assets assigned to the National Bank, the sum of $15,000 with which some of the stockholders of the State Bank purchased stock of the National Bank and the others took their shares in cash. If this $15,000 had been applied to the depositors' accounts there would have been no stockholders' liability and the stockholders of the State Bank, having used this money for their own benefit, cannot thus evade their liability.

It is further contended that the president of the State Bank had no authority to indorse the name thereof upon the notes assigned to the National Bank. The weight of authority is to the contrary. In the case of *Green v. Ashland Sixty-Third State Bank*, 346 Ill. 174, the court held:

"The president of a corporation, by virtue of his office, is the business head of the corporation, and as a general rule any contract pertaining to corporate affairs within its general powers will, when executed by the president and in the absence of proof to the contrary, be presumed to have been executed by authority of the corporation as one of the powers incident to his office. (*Bloom v. Vehon Co.*, 341 Ill. 200.) The public is not bound to inquire into the special instructions which the officers or servants of a bank may have received as to the manner in which they shall discharge their duties."

To the same effect are the following: *Bank of Minneapolis v. Griffin*, 168 Ill. 314; *Corn Belt Bank of Bloomington v. Forman*, 264 Ill. App. 589.

It is further urged by plaintiffs in error that the indorsements of the State Bank upon the notes in question were mere accommodation indorsements for the purpose of passing the title of the notes to the National Bank and therefore created no liability upon the part of the indorsing State Bank as such indorser. The indorsement of a promissory note by a State Bank without restriction carries with it the same legal obligations as that of any other indorser of a note. An indorsement may be made with limitations restricting the responsibility of the indorser or it may be made without recourse. If there was any understanding between the banks that the indorsements of the securities of the State Bank by the State Bank were limited for any particular purpose it would have been a very simple matter to have so made the indorsements in conformity therewith. Banks which deal almost

exclusively in negotiable instruments certainly should be presumed to know the law in regard to the legal obligations of indorsers of commercial paper. The law applies the same to banks as it does to individuals and no such presumption can be indulged in favor of a bank as an indorser of commercial paper.

The other alleged errors which have been presented are not necessary to be discussed because they are disposed of by what we have said in the above opinion. The decree of the circuit court is affirmed.

*Affirmed.*